UNITED STATES POSTAL SERVICE *v.* COUNCIL OF
GREENBURGH CIVIC ASSOCIATIONS ET AL.

No. 80–608.   Argued April 21, 1981—Decided June 25, 1981

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and POWELL, JJ., joined. BRENNAN, J., *post*, p. 134, and WHITE, J., *post*, p. 141, filed opinions concurring in the judgment. MARSHALL, J., *post*, p. 142, and STEVENS, J., *post*, p. 152, filed dissenting opinions.

*Edwin S. Kneedler* argued the cause for appellant. On the briefs were *Solicitor General McCree, Acting Assistant Attorney General Martin, Deputy Solicitor General Geller, Peter Buscemi, William Kanter,* and *John C. Hoyle.*

*Jon H. Hammer* argued the cause for appellees. With him on the briefs was *E. Payson Clark, Jr.**

JUSTICE REHNQUIST delivered the opinion of the Court.

We noted probable jurisdiction to decide whether the United States District Court for the Southern District of

———

**Samuel J. Cohen* filed a brief for the National Association of Letter Carriers, AFL–CIO, as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Adam Yarmolinsky* and *Stephen T. Owen* for Independent Sector et al.; and by *John R. Myer, David A. Webster, Virginia S. Taylor, E. Richard Larson,* and *Bruce J. Ennis* for the Piedmont Heights Civil Club, Inc., et al.

New York correctly determined that 18 U. S. C. § 1725, which prohibits the deposit of unstamped "mailable matter" in a letterbox approved by the United States Postal Service, unconstitutionally abridges the First Amendment rights of certain civic associations in Westchester County, N. Y. 449 U. S. 1076 (1981). Jurisdiction of this Court rests on 28 U. S. C. § 1252.

I

Appellee Council of Greenburgh Civic Associations (Council) is an umbrella organization for a number of civic groups in Westchester County, N. Y. Appellee Saw Mill Valley Civic Association is one of the Council's member groups. In June 1976, the Postmaster in White Plains, N. Y., notified the Chairman of the Saw Mill Valley Civic Association that the association's practice of delivering messages to local residents by placing unstamped notices and pamphlets in the letterboxes of private homes was in violation of 18 U. S. C. § 1725, which provides:

> "Whoever knowingly and willfully deposits any mailable matter such as statements of accounts, circulars, sale bills, or other like matter, on which no postage has been paid, in any letter box established, approved, or accepted by the Postal Service for the receipt or delivery of mail matter on any mail route with intent to avoid payment of lawful postage thereon, shall for each such offense be fined not more than $300."

Saw Mill Valley Civic Association and other Council members were advised that if they continued their practice of placing unstamped notices in the letterboxes of private homes it could result in a fine not to exceed $300.

In February 1977, appellees filed this suit in the District Court for declaratory and injunctive relief from the Postal Service's threatened enforcement of § 1725. Appellees contended that the enforcement of § 1725 would inhibit their

communication with residents of the town of Greenburgh and would thereby deny them the freedom of speech and freedom of the press secured by the First Amendment.

The District Court initially dismissed the complaint for failure to state a claim on which relief could be granted. 448 F. Supp. 159 (SDNY 1978). On appeal, however, the Court of Appeals for the Second Circuit reversed and remanded the case to the District Court to give the parties "an opportunity to submit proof as to the extent of the handicap to communication caused by enforcement of the statute in the area involved, on the one hand, and the need for the restriction for protection of the mails, on the other." 586 F. 2d 935, 936 (1978). In light of this language, it was not unreasonable for the District Court to conclude that it had been instructed to "try" the statute, much as more traditional issues of fact are tried by a court, and that is what the District Court proceeded to do.

In the proceedings on remand, the Postal Service offered three general justifications for § 1725: (1) that § 1725 protects mail revenues; (2) that it facilitates the efficient and secure delivery of the mails; and (3) that it promotes the privacy of mail patrons. More specifically, the Postal Service argued that elimination of § 1725 could cause the overcrowding of mailboxes due to the deposit of civic association notices. Such overcrowding would in turn constitute an impediment to the delivery of the mails. Testimony was offered that § 1725 aided the investigation of mail theft by restricting access to letterboxes, thereby enabling postal investigators to assume that anyone other than a postal carrier or a householder who opens a mailbox may be engaged in the violation of the law. On this point, a postal inspector testified that 10% of the arrests made under the external mail theft statute, 18 U. S. C. § 1708, resulted from surveillance-type operations which benefit from enforcement of § 1725. Testimony was also introduced that § 1725 has been

particularly helpful in the investigation of thefts of government benefit checks from letterboxes.[1]

The Postal Service introduced testimony that it would incur additional expense if § 1725 were either eliminated or held to be inapplicable to civic association materials. If delivery in mailboxes were expanded to permit civic association circulars—but not other types of nonmailable matter such as commercial materials—mail carriers would be obliged to remove and examine individual unstamped items found in letterboxes to determine if their deposit there was lawful. Carriers would also be confronted with a larger amount of unstamped mailable matter which they would be obliged to separate from outgoing mail. The extra time resulting from these additional activities, when computed on a nationwide basis, would add substantially to the daily cost of mail delivery.

The final justification offered by the Postal Service for § 1725 was that the statute provided significant protection for the privacy interests of postal customers. Section 1725 provides postal customers the means to send and receive mails without fear of their correspondence becoming known to members of the community.

---

[1] On this point, a postal investigator testified that the Postal Service tries to engage in physical surveillance on the one or two days a month that large numbers of government checks are delivered. The investigator testified that without § 1725 "we would have many more people having access to the mailboxes or being in the vicinity of the mailboxes. This type of activity could hinder our surveillances in that we would not be sure if a person we see approaching a mailbox is a subject or has a legitimate reason for being there." App. 160. The investigator also stated that the Postal Service receives "many phone calls from concerned citizens who may report that someone has been seen in the area of their mailboxes. We try to respond to that area if at all possible to determine who that individual may be." *Ibid.* The Postal Service also receives assistance from local police who may be doing a similar type of surveillance and who would have "a difficult time identifying who it is exactly going into mailboxes . . . ." *Id.,* at 161.

The Postal Service also argued at trial that the enforcement of § 1725 left appellees with ample alternative means of delivering their message. The appellees can deliver their messages either by paying postage, by hanging their notices on doorknobs, by placing their notices under doors or under a doormat, by using newspaper or nonpostal boxes affixed to houses or mailbox posts, by telephoning their constituents, by engaging in person-to-person delivery in public areas, by tacking or taping their notices on a door post or letterbox post, or by placing advertisements in local newspapers. A survey was introduced comparing the effectiveness of certain of these alternatives which arguably demonstrated that between 70–75% of the materials placed under doors or doormats or hung from doorknobs were found by the homeowner whereas approximately 82% of the items placed in letterboxes were found. This incidental difference, it was argued, cannot be of constitutional significance.

The District Court found the above arguments of the Postal Service insufficient to sustain the constitutionality of § 1725 at least as applied to these appellees. 490 F. Supp. 157 (1980). Relying on the earlier opinion of the Court of Appeals, the District Court noted that the legal standard it was to apply would give the appellees relief if the curtailment of their interest in free expression resulting from enforcement of § 1725 substantially outweighed the Government's interests in the effective delivery and protection of the mails. The District Court concluded that the appellees had satisfied this standard.

The District Court based its decision on several findings. The court initially concluded that because civic associations generally have small cash reserves and cannot afford the applicable postage rates, mailing of the appellees' message would be financially burdensome. Similarly, because of the relatively slow pace of the mail, use of the mails at certain times would impede the appellees' ability to communicate quickly with their constituents. Given the widespread aware-

ness of the high cost and limited celerity of the mails, the court probably could have taken judicial notice of both of these findings.

The court also found that none of the alternative means of delivery suggested by the Postal Service were "nearly as effective as placing civic association flyers in approved mailboxes; so that restriction on the [appellees'] delivery methods to such alternatives also constitutes a serious burden on [appellees'] ability to communicate with their constituents." 490 F. Supp., at 160.[2] Accordingly, the District Court declared § 1725 unconstitutional as applied to appellees and the Council's member associations and enjoined the Postal Service from enforcing it as to them.

## II

The present case is a good example of Justice Holmes' aphorism that "a page of history is worth a volume of logic."

---

[2] The District Court reasoned that the alternative methods suggested by the Postal Service were inadequate because they can result in the civic notices either being lost or damaged as a result of wind, rain, or snow. Weatherstripping on doors may prevent the flyers from being placed under the door. Use of plastic bags for protection of the civic notices is both time consuming and "relatively expensive for a small volunteer organization . . . ." 490 F. Supp., at 160. Deposit of materials outside may cause litter problems as well as arouse resentment among residents because it informs burglars that no one is home. Alternative methods which depend on reaching the occupant personally are less effective because their success depends on the mere chance that the person called or visited will be home at any given time. The court also found that enforcement of § 1725 against civic associations "does not appear so necessary or contributive to enforcement of the anti-theft, anti-fraud or Private Express statutes that this interest outweighs the [appellees'] substantial interest in expedient and economical communication with their constituents." Id., at 163. Based on the above, the District Court concluded that "the cost to free expression of imposing this burden on [appellees] outweighs the showing made by the Postal Service of its need to enforce the statute to promote effective delivery and protection of the mails." Id., at 162.

*New York Trust Co.* v. *Eisner,* 256 U. S. 345, 349 (1921). For only by review of the history of the postal system and its present statutory and regulatory scheme can the constitutional challenge to § 1725 be placed in its proper context.

By the early 18th century, the posts were made a sovereign function in almost all nations because they were considered a sovereign necessity. Government without communication is impossible, and until the invention of the telephone and telegraph, the mails were the principal means of communication. Kappel Commission, Toward Postal Excellence, Report of the President's Commission on Postal Organization 47 (Comm. Print 1968). Little progress was made in developing a postal system in Colonial America until the appointment of Benjamin Franklin, formerly Postmaster at Philadelphia, as Deputy Postmaster General for the American Colonies in 1753. In 1775, Franklin was named the first Postmaster General by the Continental Congress, and, because of the trend toward war, the Continental Congress undertook its first serious effort to establish a secure mail delivery organization in order to maintain communication between the States and to supply revenue for the Army. D. Adie, An Evaluation of Postal Service Wage Rates 2 (American Enterprise Institute, 1977).

Given the importance of the post to our early Nation, it is not surprising that when the United States Constitution was ratified in 1789, Art. I, § 8, provided Congress the power "To establish Post Offices and post Roads" and "To make all Laws which shall be necessary and proper" for executing this task. The Post Office played a vital yet largely unappreciated role in the development of our new Nation. Stagecoach trails which were improved by the Government to become post roads quickly became arteries of commerce. Mail contracts were of great assistance to the early development of new means of transportation such as canals, railroads, and eventually airlines. Kappel Commission, To-

ward Postal Excellence, *supra,* at 46. During this developing stage, the Post Office was to many citizens situated across the country the most visible symbol of national unity. *Ibid.*

The growth of postal service over the past 200 years has been remarkable. Annual revenues increased from less than $40 million in 1790 to close to $200 million in 1829 when the Postmaster General first became a member of the Cabinet. However, expenditures began exceeding revenues as early as the 1820's as the postal structure struggled to keep pace with the rapid growth of the country westward. Because of this expansion, delivery costs to the South and West raised average postal costs nationally. To prevent competition from private express services, Congress passed the Postal Act of 1845, which prohibited competition in letter mail and established what is today referred to as the "postal monopoly."

More recently, to deal with the problems of increasing deficits and shortcomings in the overall management and efficiency of the Post Office, Congress passed the Postal Reorganization Act of 1970. This Act transformed the Post Office Department into a Government-owned corporation called the United States Postal Service. The Postal Service today is among the largest employers in the world, with a work force nearing 700,000 processing 106.3 billion pieces of mail each year. Ann. Rep. of the Postmaster General 2, 11 (1980). The Postal Service is the Nation's largest user of floor space, and the Nation's largest nonmilitary purchaser of transport, operating more than 200,000 vehicles. Its rural carriers alone travel over 21 million miles each day and its city carriers walk or drive another million miles a day. D. Adie, An Evaluation of Postal Service Wage Rates, *supra,* at 1. Its operating budget in fiscal 1980 exceeded $17 billion. Ann. Rep. of the Postmaster General, *supra,* at 2.

Not surprisingly, Congress has established a detailed statutory and regulatory scheme to govern this country's vast postal system. See 39 U. S. C. § 401 *et seq.* and the Domestic Mail Manual (DMM), which has been incorporated by

reference in the Code of Federal Regulations, 39 CFR pt. 3 (1980). Under 39 U. S. C. § 403 (a), the Postal Service is directed to "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees." Section 403 (b)(1) similarly directs the Postal Service "to maintain an efficient system of collection; sorting, and delivery of the mail nationwide," and under 39 U. S. C. § 401 the Postal Service is broadly empowered to adopt rules and regulations designed to accomplish the above directives.

Acting under this authority, the Postal Service has provided by regulation that both urban and rural postal customers must provide appropriate mail receptacles meeting detailed specifications concerning size, shape, and dimensions. DMM 155.41, 155.43, 156.311, 156.51, and 156.54. By regulation, the Postal Service has also provided that "[e]very letter box or other receptacle intended or used for the receipt or delivery of mail on any city delivery route, rural delivery route, highway contract route, or other mail route is designated an authorized depository for mail within the meaning of 18 U. S. C. [§] 1725." DMM 151.1. A letterbox provided by a postal customer which meets the Postal Service's specifications not only becomes part of the Postal Service's nationwide system for the receipt and delivery of mail, but is also afforded the protection of the federal statutes prohibiting the damaging or destruction of mail deposited therein. See 18 U. S. C. §§ 1702, 1705, and 1708.

It is not without irony that this elaborate system of regulation, coupled with the historic dependence of the Nation on the Postal Service, has been the causal factor which led to this litigation. For it is because of the very fact that virtually every householder wishes to have a mailing address and a receptacle in which mail sent to that address will be deposited by the Postal Service that the letterbox or other mail receptacle is attractive to those who wish to convey messages within a locality but do not wish to purchase the stamp or pay such other fee as would permit them to be trans-

124

mitted by the Postal Service. To the extent that the "alternative means" eschewed by the appellees and found to be inadequate alternatives by the District Court are in fact so, it is in no small part attributable to the fact that the typical mail patron first looks for written communications from the "outside world" not under his doormat, or inside the screen of his front door, but in his letterbox. Notwithstanding the increasing frequency of complaints about the rising cost of using the Postal Service, and the uncertainty of the time which passes between mailing and delivery, written communication making use of the Postal Service is so much a fact of our daily lives that the mail patron watching for the mailtruck, or the jobholder returning from work looking in his letterbox before he enters his house, are commonplaces of our society. Indeed, according to the appellees the receptacles for mailable matter are so superior to alternative efforts to communicate printed matter that all other alternatives for deposit of such matter are inadequate substitutes for postal letterboxes.

Postal Service regulations, however, provide that letterboxes and other receptacles designated for the delivery of mail "shall be used exclusively for matter which bears postage." DMM 151.2.[3] Section 1725 merely reinforces this

[3] There appear to be at least two minor exceptions to this regulation. DMM 156.58 provides that "publishers of newspapers regularly mailed as second-class mail may, *on Sundays and national holidays only*, place copies of the Sunday or holiday issues in the rural and highway contract route boxes of subscribers, with the understanding that copies will be removed from the boxes before the next day on which mail deliveries are scheduled." This particular exception is designed to protect mail revenues by encouraging newpapers to use second-class mail for delivery of their papers. The exception allows distributors to deliver their papers in letterboxes only under certain conditions and on certain days when mail service is unavailable. A second exception to the requirement that only mail which bears postage may be placed in letterboxes is contained in DMM 156.4, which authorizes rural postal customers to leave unstamped mail in letterboxes when they also leave money for postage.

regulation by prohibiting, under pain of criminal sanctions, the deposit into a letterbox of any mailable matter on which postage has not been paid. The specific prohibition contained in § 1725 is also repeated in the Postal Service regulations at DMM 146.21.

Section 1725 was enacted in 1934 "to curb the practice of depositing statements of account, circulars, sale bills, etc., in letter boxes established and approved by the Postmaster General for the receipt or delivery of mail matter without payment of postage thereon by making this a criminal offense." H. R. Rep. No. 709, 73d Cong., 2d Sess., 1 (1934). Both the Senate and House Committees on Post Offices and Post Roads explained the principal motivation for § 1725 as follows:

"Business concerns, particularly utility companies, have within the last few years adopted the practice of having their circulars, statements of account, etc., delivered by private messenger, and have used as receptacles the letter boxes erected for the purpose of holding mail matter and approved by the Post Office Department for such purpose. This practice is depriving the Post Office Department of considerable revenue on matter which would otherwise go through the mails, and at the same time is resulting in the stuffing of letter boxes with extraneous matter." Ibid.; S. Rep. No. 742, 73d Cong., 2d Sess., 1 (1934).

Nothing in any of the legislation or regulations recited above requires any person to become a postal customer. Anyone is free to live in any part of the country without having letters or packages delivered or received by the Postal Service by simply failing to provide the receptacle for those letters and packages which the statutes and regulations require. Indeed, the provision for "General Delivery" in most post offices enables a person to take advantage of the facil-

ities of the Postal Service without ever having provided a receptacle at or near his premises conforming to the regulations of the Postal Service. What the legislation and regulations do require is that those persons who *do* wish to receive and deposit their mail at their home or business do so under the direction and control of the Postal Service.

## III

As early as the last century, this Court recognized the broad power of Congress to act in matters concerning the posts:

> "The power vested in Congress 'to establish post-offices and post-roads' has been practically construed, since the foundation of the government, to authorize not merely the designation of the routes over which the mail shall be carried, and the offices where letters and other documents shall be received to be distributed or forwarded, but the carriage of the mail, and all measures necessary to secure its safe and speedy transit, and the prompt delivery of its contents. The validity of legislation describing what should be carried, and its weight and form, and the charges to which it should be subjected, has never been questioned.... The power possessed by Congress embraces the regulation of the entire Postal System of the country. The right to designate what shall be carried necessarily involves the right to determine what shall be excluded." *Ex parte Jackson,* 96 U. S. 727, 732 (1878).

However broad the postal power conferred by Art. I may be, it may not of course be exercised by Congress in a manner that abridges the freedom of speech or of the press protected by the First Amendment to the Constitution. In this case we are confronted with the appellees' assertion that the First Amendment guarantees them the right to deposit, without payment of postage, their notices, circulars, and flyers in

letterboxes which have been accepted as authorized depositories of mail by the Postal Service.[4]

In addressing appellees' claim, we note that we are not here confronted with a regulation which in any way prohibits individuals from going door-to-door to distribute their message or which vests unbridled discretion in a governmental official to decide whether or not to permit the distribution to occur. We are likewise not confronted with a regulation which in any way restricts the appellees' right to use the mails. The appellees may mail their civic notices in the ordinary fashion, and the Postal Service will treat such notices identically with all other mail without regard to content. There is no claim that the Postal Service treats civic notices, because of their content, any differently from the way it treats any of the other mail it processes. Admittedly, if appellees do choose to mail their notices, they will be required to pay postage in a manner identical to other Postal Service patrons, but appellees do not challenge the imposition of a fee for the services provided by the Postal Service.[5]

---

[4] We reject appellees' additional assertion raised below that 18 U. S. C. § 1725 cannot be applied to them because it was intended to bar the deposit of commercial materials only. The statute on its face bars the deposit of "*any* mailable matter" (emphasis added) without proper postage, and, as more fully explained by the District Court in its initial opinion rejecting this contention, the legislative history makes clear that both Congress and the Postal Service understood the statute would apply to noncommercial as well as commercial materials. 448 F. Supp., at 160–162.

[5] JUSTICE BRENNAN, concurring in the result, quotes the oft repeated aphorism of Justice Holmes, dissenting, in *United States ex rel. Milwaukee Social Democratic Pub. Co.* v. *Burleson*, 255 U. S. 407, 437 (1921), that "[t]he United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues, and it would take very strong language to convince me that Congress ever intended to give such a practically despotic power to any one man." JUSTICE BRENNAN also quoted this aphorism in his opinion for the Court in *Blount* v. *Rizzi*, 400 U. S. 410, 416 (1971), a case dealing with the Postmaster General's authority to prevent distribu-

What is at issue in this case is solely the constitutionality of an Act of Congress which makes it unlawful for persons to use, without payment of a fee, a letterbox which has been designated an "authorized depository" of the mail by the Postal Service. As has been previously explained, when a letterbox is so designated, it becomes an essential part of the Postal Service's nationwide system for the delivery and receipt of mail. In effect, the postal customer, although he pays for the physical components of the "authorized depository," agrees to abide by the Postal Service's regulations in exchange for the Postal Service agreeing to deliver and pick up his mail.

Appellees' claim is undermined by the fact that a letterbox, once designated an "authorized depository," does not at the same time undergo a transformation into a "public forum" of some limited nature to which the First Amendment guarantees access to all comers. There is neither historical nor constitutional support for the characterization of a letterbox as a public forum. Letterboxes are an essential part of the nationwide system for the delivery and receipt of

---

tions of obscene matter, which has little if any relation to the present case because no one contends that appellees' circulars are obscene. JUSTICE BRENNAN, however, does not refer to the dissenting opinion of Justice Brandeis in *Burleson* (with respect to which Justice Holmes said "I agree in substance with his view." 255 U. S., at 436). There, Justice Brandeis goes into a more detailed analysis of the relationship of the mails to the prohibitions of the First Amendment, and states:

"The Government might, of course, decline altogether to distribute newspapers; or it might decline to carry any at less than the cost of service; and it would not thereby abridge the freedom of the press, since to all papers other means of transportation would be left open." *Id.*, at 431.

It seems to us that that is just what the Postal Service here has done: it has by no means declined to distribute the leaflets which appellees seek to have deposited in mailboxes, but has simply insisted that the appellees pay the same postage that any other circular in its class would have to bear. Thus, neither the dissent of Justice Brandeis nor of Justice Holmes in *Burleson* supports JUSTICE BRENNAN's position.

mail, and since 1934 access to them has been unlawful except under the terms and conditions specified by Congress and the Postal Service. As such, it is difficult to accept appellees' assertion that because it may be somewhat more efficient to place their messages in letterboxes there is a First Amendment right to do so. The underlying rationale of appellees' argument would seem to foreclose Congress or the Postal Service from requiring in the future that all letterboxes contain locks with keys being available only to the homeowner and the mail carrier. Such letterboxes are presently found in many apartment buildings, and we do not think their presence offends the First Amendment to the United States Constitution. Letterboxes which lock, however, have the same effect on civic associations that wish access to them as does the enforcement of § 1725. Such letterboxes also accomplish the same purpose—that is, they protect mail revenues while at the same time facilitating the secure and efficient delivery of the mails. We do not think the First Amendment prohibits Congress from choosing to accomplish these purposes through legislation as opposed to lock and key.

Indeed, it is difficult to conceive of any reason why this Court should treat a letterbox differently for First Amendment access purposes than it has in the past treated the military base in *Greer* v. *Spock,* 424 U. S. 828 (1976), the jail or prison in *Adderley* v. *Florida,* 385 U. S. 39 (1966), and *Jones* v. *North Carolina Prisoners' Union,* 433 U. S. 119 (1977), or the advertising space made available in city rapid transit cars in *Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (1974). In all these cases, this Court recognized that the First Amendment does not guarantee access to property simply because it is owned or controlled by the government. In *Greer* v. *Spock, supra,* the Court cited approvingly from its earlier opinion in *Adderley* v. *Florida, supra,* wherein it explained that " '[t]he State, no less than a private owner of

property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" 424 U. S., at 836.[6]

This Court has not hesitated in the past to hold invalid

---

[6] JUSTICE BRENNAN argues that a letterbox is a public forum because "the mere deposit of mailable matter without postage is not 'basically incompatible' with the 'normal activity' for which a letterbox is used, *i. e.*, deposit of mailable matter with proper postage or mail delivery by the Postal Service. On the contrary, the mails and the letterbox are specifically used for the communication of information ahd ideas, and thus surely constitute a public forum appropriate for the exercise of First Amendment rights subject to reasonable time, place, and manner restrictions such as those embodied in § 1725 . . . ." *Post,* at 137–138.

JUSTICE BRENNAN's analysis assumes that simply because an instrumentality "is used for the communication of ideas or information," it thereby becomes a public forum. Our cases provide no support for such a sweeping proposition. Certainly, a bulletin board in a cafeteria at Fort Dix is "specifically used for the communication of information and ideas," but such a bulletin board is no more a "public forum" than are the street corners and parking lots found not to be so at the same military base. *Greer* v. *Spock,* 424 U. S. 828 (1976). Likewise, the advertising space made available in public transportation in the city of Shaker Heights is "specifically used for the communication of information and ideas," but that fact alone was not sufficient to transform that space into a "public forum" for First Amendment purposes. *Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (1974). In fact, JUSTICE BLACKMUN recognized in *Lehman* that:

"Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require." *Id.,* at 304.

For the reasons we have stated at length in our opinion, we think the appellees' First Amendment activities are wholly incompatible with the maintenance of a nationwide system for the safe and efficient delivery of mail. The history of the postal system and the role the letterbox serves within that system supports this conclusion, and even JUSTICE BRENNAN acknowledges that a "significant governmental interest" is advanced by the restriction imposed by § 1725. *Post,* at 135.

laws which it concluded granted too much discretion to public officials as to who might and who might not solicit individual homeowners, or which too broadly inhibited the access of persons to traditional First Amendment forums such as the public streets and parks. See, *e. g., Village of Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620 (1980); *Hague* v. *CIO,* 307 U. S. 496 (1939); *Schneider* v. *State,* 308 U. S. 147 (1939); *Martin* v. *City of Struthers,* 319 U. S. 141 (1943); *Lovell* v. *City of Griffin,* 303 U. S. 444 (1938); and *Police Department of Chicago* v. *Mosley,* 408 U. S. 92 (1972). But it is a giant leap from the traditional "soapbox" to the letterbox designated as an authorized depository of the United States mails, and we do not believe the First Amendment requires us to make that leap.[7]

---

[7] JUSTICE MARSHALL in his dissent, *post,* at 143, states that he disagrees "with the Court's assumption that if no public forum is involved, the only First Amendment challenges to be considered are whether the regulation is content-based . . . and reasonable . . . ." The First Amendment prohibits Congress from "abridging freedom of speech, or of the press," and its ramifications are not confined to the "public forum" first noted in *Hague* v. *CIO,* 307 U. S. 496 (1939). What we hold is the principle reiterated by cases such as *Adderley* v. *Florida,* 385 U. S. 39 (1966), and *Greer* v. *Spock, supra,* that property owned or controlled by the government which is *not* a public forum may be subject to a prohibition of speech, leafleting, picketing, or other forms of communication without running afoul of the First Amendment. Admittedly, the government must act reasonably in imposing such restrictions, *Jones* v. *North Carolina Prisoners' Union,* 433 U. S. 119, 130–131 (1977), and the prohibition must be content-neutral. But, for the reasons stated in our opinion, we think it cannot be questioned that § 1725 is both a reasonable and content-neutral regulation.

Even JUSTICE MARSHALL's dissent recognizes that the Government may defend the regulation here on a ground other than simply a "time, place, and manner" basis. For example, he says in dissent, *post,* at 143: "The question, then, is whether this statute burdens any First Amendment rights enjoyed by appellees. If so, it must be determined whether this burden is justified by a significant governmental interest substantially advanced by the statute." We think § 1725 satisfies even the test articulated by JUSTICE MARSHALL.

## IV

It is thus unnecessary for us to examine § 1725 in the context of a "time, place, and manner" restriction on the use of the traditional "public forums" referred to above. This Court has long recognized the validity of reasonable time, place, and manner, regulations on such a forum so long as the regulation is content-neutral, serves a significant governmental interest, and leaves open adequate alternative channels for communication. See, e. g., *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S. 530, 535–536 (1980); *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 93 (1977); *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 771 (1976); *Grayned* v. *City of Rockford,* 408 U. S. 104 (1972); *Cox* v. *New Hampshire,* 312 U. S. 569 (1941). But since a letterbox is not traditionally such a "public forum," the elaborate analysis engaged in by the District Court was, we think, unnecessary. To be sure, if a governmental regulation is based on the content of the speech or the message, that action must be scrutinized more carefully to ensure that communication has not been prohibited " 'merely because public officials disapprove the speaker's view.' " *Consolidated Edison Co.* v. *Public Service Comm'n, supra,* at 536, quoting *Niemotko* v. *Maryland,* 340 U. S. 268, 282 (1951) (Frankfurter, J., concurring in result). But in this case there simply is no question that § 1725 does not regulate speech on the basis of content. While the analytical line between a regulation of the "time, place, and manner" in which First Amendment rights may be exercised in a traditional public forum, and the question of whether a particular piece of personal or real property owned or controlled by the government is in fact a "public forum" may blur at the edges, we think the line is nonetheless a workable one. We likewise think that Congress may, in exercising its authority to develop and operate a national postal system, properly legislate with the generality of cases in mind, and

should not be put to the test of defending in one township after another the constitutionality of a statute under the traditional "time, place, and manner" analysis. This Court has previously acknowledged that the "guarantees of the First Amendment have never meant 'that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.' " *Greer* v. *Spock,* 424 U. S., at 836, quoting *Adderley* v. *Florida,* 385 U. S., at 48. If Congress and the Postal Service are to operate as efficiently as possible a system for the delivery of mail which serves a Nation extending from the Atlantic Ocean to the Pacific Ocean, from the Canadian boundary on the north to the Mexican boundary on the south, it must obviously adopt regulations of general character having uniform applicability throughout the more than three million square miles which the United States embraces. In so doing, the Postal Service's authority to impose regulations cannot be made to depend on all of the variations of climate, population, density, and other factors that may vary significantly within a distance of less than 100 miles.

## V

From the time of the issuance of the first postage stamp in this country at Brattleboro, Vt., in the fifth decade of the last century, through the days of the governmentally subsidized "Pony Express" immediately before the Civil War, and through the less admirable era of the Star Route Mail Frauds in the latter part of that century, Congress has actively exercised the authority conferred upon it by the Constitution "to establish Post Offices and Post Roads" and "to make all laws which shall be necessary and proper" for executing this task. While Congress, no more than a suburban township, may not by its own *ipse dixit* destroy the "public forum" status of streets and parks which have historically been public forums, we think that for the reasons stated a letterbox may not properly be analogized to streets and parks.

It is enough for our purposes that neither the enactment nor the enforcement of § 1725 was geared in any way to the content of the message sought to be placed in the letterbox. The judgment of the District Court is accordingly

*Reversed.*

JUSTICE BRENNAN, concurring in the judgment.

I concur in the judgment, but not in the Court's opinion. I believe the Court errs in not determining whether § 1725 is a reasonable time, place, and manner restriction on appellees' exercise of their First Amendment rights, as urged by the Government, and in resting its judgment instead on the conclusion that a letterbox is not a public forum. In my view, this conclusion rests on an improper application of the Court's precedents and ignores the historic role of the mails as a national medium of communication.

I

Section 1725 provides:

"Whoever knowingly and willfully deposits any mailable matter such as statements of accounts, circulars, sale bills, or other like matter, on which no postage has been paid, in any letter box established, approved, or accepted by the Postal Service for the receipt or delivery of mail matter on any mail route with intent to avoid payment of lawful postage thereon, shall for each such offense be fined not more than $300." 18 U. S. C. § 1725.

Unquestionably, § 1725 burdens in some measure the First Amendment rights of appellees who seek to "communicate ideas, positions on local issues, and civic information to their constituents," through delivery of circulars door-to-door. 490 F. Supp. 157, 162 (1980). See *Martin* v. *City of Struthers,* 319 U. S. 141, 146–147 (1943). The statute requires appellees either to pay postage to obtain access to the postal system, which they assert they are unable to do, or to deposit

their materials in places other than the letterbox, which they contend is less effective than deposit in the letterbox.

Despite the burden on appellees' rights, I conclude that the statute is constitutional because it is a reasonable time, place, and manner regulation. See *Schad* v. *Mount Ephraim,* 452 U. S. 61, 74–77 (1981); *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S. 530, 535–536 (1980); *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 93 (1977); *Grayned* v. *City of Rockford,* 408 U. S. 104, 115–116 (1972). First, § 1725 is content-neutral because it is not directed at the content of the message appellees seek to convey, but applies equally to all mailable matter. See *Consolidated Edison Co.* v. *Public Service Comm'n, supra,* at 536; *Erznoznik* v. *City of Jacksonville,* 422 U. S. 205, 209–211 (1975); *Police Department of Chicago* v. *Mosley,* 408 U. S. 92, 95 (1972).

Second, the burden on expression advances a significant governmental interest—preventing loss of mail revenues. The District Court's finding that the "failure to enforce the statute as to [appellees] would [not] result in a *substantial* loss of revenue" may be true, 490 F. Supp. 157, 163 (emphasis added), but that conclusion overlooks the obvious cumulative effect that the District Court's ruling would have if applied across the country. Surely, the Government is correct when it argues that the Postal Service "is not required to make a case-by-case showing of a compelling need for the incremental revenue to be realized from charging postage to each organization or individual who desires to use the postal system to engage in expression protected by the First Amendment." Reply Brief for Appellant 8.

Third, there are "ample alternative channels for communication." *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S., at 535. Appellees may, for example, place their circulars under doors or attach them to doorknobs. Simply because recipients may find 82% of materials left in the letterbox, but only 70–75% of materials otherwise left at the residence, is not a sufficient reason to conclude that alterna-

tive means of delivery are not "ample." *Ibid.;* see *ante,* at 120, and n. 2.

## II

The Court declines to analyze § 1725 as a time, place, and manner restriction. Instead, it concludes that a letterbox is not a public forum. *Ante,* at 128. Thus the Court states that

> "it is difficult to conceive of any reason why this Court should treat a letterbox differently for First Amendment access purposes than it has in the past treated the military base in *Greer* v. *Spock,* 424 U. S. 828 (1976), the jail or prison in *Adderley* v. *Florida,* 385 U. S. 39 (1966), and *Jones* v. *North Carolina Prisoners' Union,* 433 U. S. 119 (1977), or the advertising space made available in city rapid transit cars in *Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (1974)." *Ante,* at 129.

I believe that the Court's conclusion ignores the proper method of analysis in determining whether property owned or directly controlled by the Government is a public forum. Moreover, even if the Court were correct that a letterbox is not a public forum, the First Amendment would still require the Court to determine whether the burden on appellees' exercise of their First Amendment rights is supportable as a reasonable time, place, and manner restriction.

## A

For public forum analysis, "[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned* v. *City of Rockford, supra,* at 116. We have often quoted Justice Holmes' observation that the " 'United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is almost as much a part of free speech as the right to use our tongues . . . .' " *Blount* v. *Rizzi,* 400 U. S. 410, 416 (1971), and *Lamont* v. *Postmaster General,* 381 U. S. 301, 305 (1965), quoting *United States ex*

*rel. Milwaukee Social Democratic Pub. Co.* v. *Burleson,* 255 U. S. 407, 437 (1921) (Holmes, J., dissenting).[1] Our cases have recognized generally that public properties are appropriate fora for exercise of First Amendment rights. See, *e. g., Tinker* v. *Des Moines School District,* 393 U. S. 503, 512 (1969); *Brown* v. *Louisiana,* 383 U. S. 131, 139–140, 142 (1966) (plurality opinion); *Cox* v. *Louisiana,* 379 U. S. 536, 543 (1965); *Edwards* v. *South Carolina,* 372 U. S. 229 (1963).[2] While First Amendment rights exercised on public property may be subject to reasonable time, place, and manner restrictions, that is very different from saying that government-controlled property, such as a letterbox, does not constitute a public forum. Only where the exercise of First Amendment rights is incompatible with the normal activity occurring on public property have we held that the property is not a public forum. See *Greer* v. *Spock,* 424 U. S. 828 (1976); *Jones* v. *North Carolina Prisoners' Union,* 433 U. S. 119 (1977); *Adderley* v. *Florida,* 385 U. S. 39 (1966). Thus, in answering "[t]he crucial question . . . whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time," *Grayned* v. *City of Rockford, supra,* at 116, I believe that the mere deposit of mailable matter without postage is not "basically incompatible" with the "normal activity" for which a letterbox is used, *i. e.,* deposit of mailable matter with proper postage or mail delivery by the Postal Service. On the contrary, the mails and the letterbox are specifically used for the communication of information and ideas, and thus surely constitute a public

---

[1] It would make no sense to conclude that the "mails" are a vital medium of expression, but that letterboxes are not. Inasmuch as the Postal Service, by regulation, requires postal customers to provide appropriate mail receptacles conforming to specified dimensions, the letterbox is an indispensable component of the mail system.

[2] Of course, the postal power must be exercised in a manner consistent with the First Amendment. See *Blount* v. *Rizzi,* 400 U. S. 410, 416 (1971); *Lamont* v. *Postmaster General,* 381 U. S. 301, 305–306 (1965).

forum appropriate for the exercise of First Amendment rights subject to reasonable time, place, and manner restrictions such as those embodied in § 1725 or in the requirement that postage be affixed to mailable matter to obtain access to the postal system.

The history of the mails as a vital national medium of expression confirms this conclusion. (Just as "streets and parks . . . have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," *Hague* v. *CIO,* 307 U. S. 496, 515 (1939),[3] so too the mails from the early days of the Republic have played a crucial role in communication. The Court itself acknowledges the importance of the mails as a forum for communication:

> "Government without communication is impossible, and until the invention of the telephone and telegraph, *the mails were the principal means of communication. . . .* In 1775, Franklin was named the first Postmaster General by the Continental Congress, and, because of the trend toward war, the Continental Congress undertook its first serious effort to establish a secure mail delivery organization in order to maintain communication between the States and to supply revenue for the Army." *Ante,* at 121 (emphasis added).

The Court further points out that "[t]he Post Office played a *vital* . . . role in the development of our new Nation," *ibid.* (emphasis added), and currently processes "106.3 billion pieces of mail each year," *ante,* at 122. The variety of communication transported by the Postal Service ranges from the sublime to the ridiculous, and includes newspapers, magazines, books, films, and almost any type and form of expression imaginable. See Kappel Commission, Toward Postal Excel-

---

[3] See generally Gibbons, Hague *v.* CIO: A Retrospective, 52 N. Y. U. L. Rev. 731 (1977).

lence, Report of the President's Commission on Postal Organization 47–48 (Comm. Print 1968). Given "the historic dependence of the Nation on the Postal Service," *ante,* at 123, it is extraordinary that the Court reaches the conclusion that the letterbox, a critical link in the mail system, is not a public forum.

Not only does the Court misapprehend the historic role that the mails have played in national communication, but it relies on inapposite cases to reach its result. *Greer* v. *Spock,*[4] *Adderley* v. *Florida,*[5] and *Jones* v. *North Carolina Prisoners' Union,*[6] all rested on the inherent incompatibility between the

---

[4] In *Greer* v. *Spock,* 424 U. S. 828 (1976), pursuant to base regulations political candidates were denied permission to distribute campaign literature and to hold a political meeting on a military base. In upholding the challenged regulations, the Court specifically relied on the unique function of military installations "to train soldiers, not to provide a public forum," *id.,* at 838, and the historic power of a commanding officer " 'to exclude civilians from the area of his command.' " *Ibid.,* quoting *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 893 (1961).

[5] In *Adderley* v. *Florida,* 385 U. S. 39 (1966), the Court upheld trespass convictions of students who were demonstrating on jailhouse property, relying principally on the purpose of jails, "built for security purposes," *id.,* at 41, which unlike "state capitol grounds," are not open to the public. *Ibid.*

[6] In *Jones* v. *North Carolina Prisoners' Union,* 433 U. S. 119 (1977), prisoners challenged the constitutionality of prison regulations prohibiting prisoners from soliciting other inmates to join a prisoners' labor union and barring union meetings and bulk mailings concerning the union from outside sources. The Court upheld the regulations in the face of a First Amendment challenge on the basis that the First Amendment activity was incompatible with "reasonable considerations of penal management." *Id.,* at 132. The Court also rejected the prisoners' equal protection challenge. The Court analogized a prison to a military base, stating that a "prison may be no more easily converted into a public forum than a military base," *id.,* at 134, and concluded that prison officials could treat the union differently from other organizations such as the Jaycees and Alcoholics Anonymous for meetings and for bulk mailing purposes, because the "chartered purpose of the Union . . . was illegal under North Carolina law." *Id.,* at 135–136.

rights sought to be exercised and the physical location in which the exercise was to occur. *Lehman* v. *City of Shaker Heights*[7] rested in large measure on the captive audience doctrine, 418 U. S., at 304, and in part on the transportation purpose of the city bus system, *id.*, at 303. These cases, therefore, provide no support for the Court's conclusion that a letterbox is not a public forum.

## B

Having determined that a letterbox is not a public forum, the Court inexplicably terminates its analysis. Surely, however, the mere fact that property is not a public forum does not free government to impose unwarranted restrictions on First Amendment rights. The Court itself acknowledges that the postal power "may not . . . be exercised by Congress in a manner that abridges the freedom of speech or of the press protected by the First Amendment to the Constitution." *Ante,* at 126. Even where property does not constitute a public forum, government regulation that is content-neutral must still be reasonable as to time, place, and manner. See, *e. g., Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 63, n. 18 (1976). Cf. *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S., at 92–93; *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 771 (1976). The

---

[7] In *Lehman* v. *City of Shaker Heights,* 418 U. S. 298 (1974), the Court upheld a ban on political advertising in buses, but only four Justices concluded that advertising space in a city transit system is not a First Amendment forum. They reached that result because the transit system sought, by its limitation on political speech, "to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience." *Id.,* at 304. Justice Douglas concurred in the judgment on the narrow ground that petitioner had no constitutional right to force his message upon a captive audience. Joined by JUSTICES STEWART, MARSHALL, and POWELL, I dissented on the ground that "the city created a forum for the dissemination of information and expression of ideas when it accepted and displayed commercial and public service advertisements on its rapid transit vehicles." *Id.,* at 310.

restriction in § 1725 could have such an effect on First Amendment rights—and does for JUSTICE MARSHALL—that it should be struck down. The Court, therefore, cannot avoid analyzing § 1725 as a time, place, and manner restriction.[8]

## III

I would conclude, contrary to the Court, that a letterbox is a public forum, but, nevertheless, concur in the judgment because I conclude that 18 U. S. C. § 1725 is a reasonable time, place, and manner restriction on appellees' exercise of their First Amendment rights.

JUSTICE WHITE, concurring in the judgment.

There is no doubt that the postal system is a massive, Government-operated communications facility open to all forms of written expression protected by the First Amendment. No one questions, however, that the Government, the operator of the system, may impose a fee on those who would use the system, even though the user fee measurably reduces the ability of various persons or organizations to communicate with others. Appellees do not argue that they may use the mail for home delivery free of charge. A self-evident justification for postage is that the Government may insist that those who use the mails contribute to the expense of maintaining and operating the facility.

No different answer is required in this case because appellees do not insist on free home delivery and desire to use only a part of the system, the mailbox. The Government's interest in defraying its operating expenses remains, and it is clear

---

[8] Even if the letterbox were characterized as purely private property that is being regulated by the Government, rather than property which has become incorporated into the "Postal Service's nationwide system for the receipt and delivery of mail," *ante*, at 123, § 1725 would still be subject to time, place, and manner analysis. See, *e. g., Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 63, n. 18 (1976).

that stuffing the mailbox with unstamped materials is a burden on the system.

This justification would suffice even in those situations where insisting on the fee will totally prevent the putative user from communicating with his intended correspondents, i. e., there would be no adequate alternative means available to reach the intended recipients. For this reason, if for no other, I do not find it appropriate to inquire whether the restriction at issue here is a reasonable time, place or manner regulation. Besides that, however, it is apparent that the validity of user fees does not necessarily depend on satisfying typical time, place or manner requirements.

Equally bootless is the inquiry whether the postal system is a public forum. For all who will pay the fee, it obviously is, and the only question is whether a user fee may be charged, as a general proposition and in the circumstances of this case. Because I am quite sure that the fee is a valid charge, I concur in the judgment.

JUSTICE MARSHALL, dissenting.

When the Framers of the Constitution granted Congress the authority "[t]o establish Post Offices and Post Roads," Art. I, § 8, cl. 7, they placed the powers of the Federal Government behind a national communication service. Protecting the economic viability and efficiency of that service remains a legitimate and important congressional objective. This case involves a statute defended on that ground, but I believe it is unnecessary for achieving that purpose and inconsistent with the underlying commitment to communication.

The challenged statute, 18 U. S. C. § 1725, prohibits anyone from knowingly placing unstamped "mailable matter" in any box approved by the United States Postal Service for receiving or depositing material carried by the Postal Service. Violators may be punished with fines of up to $300 for each offense. In this case, appellee civic associations claimed, and

the District Court agreed, that this criminal statute unreasonable restricts their First Amendment right of free expression.

The Court today upholds the statute on the theory that its focus—the letterbox situated on residential property—is not a public forum to which the First Amendment guarantees access. I take exception to the result, the analysis, and the premise that private persons lose their prerogatives over the letterboxes they own and supply for mail service.

First, I disagree with the Court's assumption that if no public forum is involved, the only First Amendment challenges to be considered are whether the regulation is content-based, see *ante,* at 132–133, and reasonable, *ante,* at 131, n. 7. Even if the Postal Service were not a public forum, which, as I later suggest, I do not accept, the statute advanced in its aid is a law challenged as an abridgment of free expression. Appellees seek to carry their own circulars and to deposit them in letterboxes owned by private persons who use them to receive mail, and challenge the criminal statute forbidding this use of private letterboxes. The question, then, is whether this statute burdens any First Amendment rights enjoyed by appellees. If so, it must be determined whether this burden is justified by a significant governmental interest substantially advanced by the statute. See *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S. 530, 540 (1980); *Grayned* v. *City of Rockford,* 408 U. S. 104, 115 (1972); *Cameron* v. *Johnson,* 390 U. S. 611, 616–617 (1968); *Thornhill* v. *Alabama,* 310 U. S. 88, 96, 104–105 (1940).

That appellee civic associations enjoy the First Amendment right of free expression cannot be doubted; both their purposes and their practices fall within the core of the First Amendment's protections. We have long recognized the constitutional rights of groups which seek, as appellees do, to "communicate ideas, positions on local issues, and civic information to their constituents"[1] through written handouts

---

[1] 490 F. Supp. 157, 162 (1980).

and thereby to promote the free discussion of governmental affairs so central to our democracy. See, *e. g., Martin* v. *City of Struthers,* 319 U. S. 141, 146–147 (1943); *Schneider* v. *State,* 308 U. S. 147 (1939); *Lovell* v. *Griffin,* 303 U. S. 444 (1938). By traveling door to door to hand-deliver their messages to the homes of community members, appellees employ the method of written expression most accessible to those who are not powerful, established, or well financed. "Door to door distribution of circulars is essential to the poorly financed causes of little people." *Martin* v. *City of Struthers, supra,* at 146. See *Schneider* v. *State, supra,* at 164. Moreover, "[f]reedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way." *Murdock* v. *Pennsylvania,* 319 U. S. 105, 111 (1943). And such freedoms depend on liberty to circulate; " 'indeed, without circulation, the publication would be of little value.' " *Talley* v. *California,* 362 U. S. 60, 64 (1960), quoting *Lovell* v. *Griffin, supra,* at 452.

Countervailing public interests, such as protection against fraud and preservation of privacy, may warrant some limitation on door-to-door solicitation and canvassing. But we have consistently held that any such restrictions, to be valid, must be narrowly drawn " 'in such a manner as not to intrude upon the rights of free speech.' " *Hynes* v. *Mayor and Council of Borough of Oradell,* 425 U. S. 610, 616 (1976), quoting *Thomas* v. *Collins,* 323 U. S. 516, 540–541 (1945). Consequently, I cannot agree with the Court's conclusion, *ante,* at 132–133, that we need not ask whether the ban against placing such messages in letterboxes is a restriction on appellees' free expression rights. Once appellees are at the doorstep, only § 1725 restricts them from placing their circulars in the box provided by the resident. The District Court determined after an evidentiary hearing that only by placing their circulars in the letterboxes may appellees be certain that their messages will be secure from wind, rain, or snow, and at the same time will alert the attention of the residents without

notifying would-be burglars that no one has returned home to remove items from doorways or stoops. 490 F. Supp. 157, 160–163 (1980). The court concluded that the costs and delays of mail service put the mails out of appellees' reach, and that other alternatives, such as placing their circulars in doorways, are "much less satisfactory." *Id.*, at 160.[2] We have in the past similarly recognized the burden placed on First Amendment rights when the alternative channels of communication involve more cost, less autonomy, and reduced likelihood of reaching the intended audience. *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 93 (1977).

I see no ground to disturb these factual determinations of the trier of fact. And, given these facts, the Postal Service bears a heavy burden to show that its interests are legitimate and substantially served by the restriction of appellees' freedom of expression. See, *e. g., Hynes* v. *Mayor and Council of the Borough of Oradell, supra,* at 617–618; *Konigsberg* v. *State Bar of California,* 366 U. S. 36, 49–51 (1961); *Marsh* v. *Alabama,* 326 U. S. 501, 509 (1946). Although the majority does not rule that the trial court's findings were clearly erroneous, as would be required to set them aside, the Court finds persuasive the interests asserted by the Postal Service in defense of the statute. Those interests—"protect[ing] mail revenues while at the same time facilitating the secure and efficient delivery of the mails," *ante,* at 129—are indeed both legitimate and important. But mere assertion of an important, legitimate interest does not satisfy the requirement that the challenged restriction specifically and precisely serve that end. See *Hynes* v. *Mayor and Council of the Borough of*

---

[2] Indeed, the record in this litigation indicates that appellees circulated less information when inhibited from using the letterboxes. Plaintiffs' Answer to Written Interrogatories, Record, Doc. No. 23, ¶ 8, pp. 6–7. The practical effect of applying the statute in residential communities would preclude Girl Scouts, Boy Scouts, charities, neighbors, and others from leaving invitations or notes in the place residents most likely check for messages.

*Oradell, supra.* See also *Cox* v. *Louisiana,* 379 U. S. 536, 557–558 (1965) (restriction must be applied uniformly and nondiscriminatorily).

Here, the District Court concluded that the Postal Service "has not shown that failure to enforce the statute as to [appellees] would result in a substantial loss of revenue, or a significant reduction in the government's ability to protect the mails by investigating and prosecuting mail theft, mail fraud, or unauthorized private mail delivery service." 490 F. Supp., at 163.[3] In light of this failure of proof, I cannot join the Court's conclusion that the Federal Government may thus curtail appellees' ability to inform community residents about local civic matters. That decision, I fear, threatens a departure from this Court's belief that free expression, as "the matrix, the indispensable condition, of nearly every other form of freedom," *Palko* v. *Connecticut,* 302 U. S. 319, 327 (1937), must not yield unnecessarily before such governmental interests as economy or efficiency. Certainly, free expression should not have to yield here, where the intruding statute has seldom been enforced.[4] As the exceptions created

---

[3] The Government's interest in ensuring the security of the mails is advanced more directly by 18 U. S. C. §§ 1341, 1708. To the extent that the security and efficiency problems are attributed to overcrowding in letterboxes, the problem could be resolved simply by requiring larger boxes.

As for protection of mail revenues, it is significant that the District Court found the cost of using the mails prohibitive, given appellees' budgets, and the delays in mail delivery too great to make it useful for appellees' needs. 490 F. Supp., at 160. Apparently, appellees' compliance with 18 U. S. C. § 1725 would not increase mail revenues. Although protection of the Postal Service obviously must take the form of national regulation, having broad application, a statute's nondiscriminatory terms may not save it where infringement of speech is demonstrated. *Murdock* v. *Pennsylvania,* 319 U. S. 105, 115 (1943).

[4] Appellant conceded at oral argument that the Postal Service knew of no convictions and only one attempted prosecution under the statute. Tr. of Oral Arg. 15. That unsuccessful prosecution was dismissed because the District Court found impermissibly vague the prohibition on depositing

by the Postal Service itself demonstrate,[5] the statute's asserted purposes easily could be advanced by less intrusive alternatives, such as a nondiscriminatory permit requirement for depositing unstamped circulars in letterboxes.[6] Therefore, I would find 18 U. S. C. § 1725 constitutionally defective.

Even apart from the result in this case, I must differ with the Court's use of the public forum concept to avoid application of the First Amendment. Rather than a threshold barrier that must be surmounted before reaching the terrain of the First Amendment, the concept of a public forum has more properly been used to open varied governmental locations to equal public access for free expression, subject to the constraints on time, place, or manner necessary to preserve the governmental function. *E. g., Grayned* v. *City of Rockford,* 408 U. S., at 115–117 (area around public school); *Chicago Area Military Project* v. *Chicago,* 508 F. 2d 921 (CA7) (city airport), cert. denied, 421 U. S. 992 (1975); *Albany Welfare Rights Organization* v. *Wyman,* 493 F. 2d 1319 (CA2) (welfare office waiting room), cert. denied *sub nom. Lavine* v. *Albany Welfare Rights Organization,* 419 U. S. 838 (1974);

---

unstamped "mailable matter such as statements of account, circulars, sales bills, or *other like matter." United States* v. *Rogers,* Cr. No. 72–87 (MD La. Feb. 16, 1973) (emphasis added). Apparently, no prosecutions have since been attempted, although the statute may be used to support the efforts of local postal offices in collecting unpaid postage. Tr. of Oral Arg. 15.

[5] The Postal Service has interpreted the statute to exempt mailslots, *id.,* at 8, and to provide exception for certain kinds of deliveries, Domestic Mail Manual (DMM) 156.58 (newspapers, normally mailed but delivered on Sunday or holidays); 39 CFR § 310.6 (1979) (letters dispatched within 50 miles of destination and same-day delivery). And by applying only to "mailable matter," the statute excludes pornography and other items not lawfully carried by the Postal Service. The Service thus has itself acknowledged that the statute sweeps more broadly than necessary.

[6] Such a permit requirement could accomplish the central purpose of the statute—to restrain commercial enterprises from avoiding postal fees by employing their own delivery services. See *ante,* at 125.

*Wolin* v. *Port of New York Authority,* 392 F. 2d 83 (CA2) (port authority), cert. denied, 393 U. S. 940 (1968); *Reilly* v. *Noel,* 384 F. Supp. 741 (RI 1974) (rotunda of courthouse). See generally *Lehman* v. *City of Shaker Heights,* 418 U. S. 298, 303 (1974); Stone, Fora Americana: Speech in Public Places, S. Ct. Rev. 233, 251–252 (1974). These decisions apply the public forum concept to secure the First Amendment's commitment to expression unfettered by governmental designation of its proper scope, audience, or occasion.

I believe these precedents support my conclusion that appellees should prevail in their First Amendment claim. The traditional function of the mails led this Court to embrace Justice Holmes' statement that " '[t]he United States may give up the Post Office when it sees fit, but while it carries it on the use of the mails is as much a part of free speech as the right to use our tongues . . . .' " *Lamont* v. *Postmaster General,* 381 U. S. 301, 305 (1965), quoting *United States ex rel. Milwaukee Social Democratic Pub. Co.* v. *Burleson,* 255 U. S. 407, 437 (1921) (Holmes, J., dissenting). Given its pervasive and traditional use as purveyor of written communication, the Postal Service, I believe, may properly be viewed as a public forum. The Court relies on easily distinguishable cases in reaching the contrary conclusion. For the Postal Service's very purpose is to facilitate communication, which surely differentiates it from the military bases, jails, and mass transportation discussed in cases relied on by the Court, *ante,* at 129–130.[7] Cf. *Tinker* v. *Des Moines Independent School*

---

[7] Rather than supporting the conclusion that the Postal Service letterbox is not a public forum, the cases cited by the majority, *ante,* at 129–130, in fact point in the other direction. The Court resolved two First Amendment issues in *Jones* v. *North Carolina Prisoners' Union,* 433 U. S. 119 (1977): the scope of associational rights retained by convicted prisoners, and their right, if any, to bulk mail rates. The Court analyzed both issues under the principle that while in prison, "an inmate does not retain those First Amendment rights that are 'inconsistent with his status as a prisoner or with the legitimate penological objectives of the correc-

*Dist.,* 393 U. S. 503, 512 (1969). Drawing from the exceptional cases, where speech has been limited for special reasons, does not strike me as commendable analysis.

The inquiry in our public forum cases has instead asked whether "the manner of expression is basically incompatible

tions system.'" *Id.,* at 129, quoting *Pell* v. *Procunier,* 417 U. S. 817, 822 (1974). No such principle applies to appellees. Furthermore, the public forum analysis in *Jones* asked whether exercise of the First Amendment rights would be incompatible with the purposes of the governmental facility, a question answerable in the negative in this case.

In *Greer* v. *Spock,* 424 U. S. 828, 838 (1976), the Court concluded that Fort Dix was not a public forum due to its military purpose and the power of "'the commanding officer summarily to exclude civilians from the area of his command'" (quoting *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 893 (1961)). At the same time, the Court emphasized that political campaign literature could still be distributed at the base unless it posed a clear danger to troop discipline and loyalty, 424 U. S., at 840. Thus, the base remained a "public forum" at least for written communication. A plurality of the Court in *Lehman* v. *City of Shaker Heights,* 418 U. S. 298, 303–304 (1974), found the city transit system not a public forum because its advertising space was incidental to its primary commercial transportation purpose. The plurality nevertheless recognized that the state action present necessitated a balancing analysis of the First Amendment interests of those seeking advertising space and the interests of the government and the users of the transit system. Further, both the plurality and Justice Douglas, in his separate opinion concurring in the result, relied on an analogy to the mass media which has no obligation under the First Amendment to broadcast or print any particular story or advertisement. *Id.,* at 303 (opinion of BLACKMUN, J.); *id.,* at 306 (opinion of Douglas, J.). In contrast, the Postal Service is obliged to accept all mailable matter. Finally, in *Adderley* v. *Florida,* 385 U. S. 39 (1966), the security needs of the jail were critical to the Court's conclusion that trespassers on the jail grounds could properly be prosecuted. *Adderley* itself noted that spaces more traditionally used by the public would more likely be public forums, *id.,* at 41–42, and this treatment is appropriate here, given the traditional public use of the Postal Service. The determinative question in each of these cases was not whether the government owned or controlled the property, but whether the nature of the governmental interests warranted the restrictions on expression. That is the question properly asked in this case.

with the normal activity of a particular place at a particular time." *Grayned* v. *City of Rockford,* 408 U. S., at 116. Compare *Grayned* v. *City of Rockford* (restriction on speech permissible near school while in session) with *Tinker* v. *Des Moines Independent School Dist., supra* (symbolic speech protected even during school hours); *Cameron* v. *Johnson,* 390 U. S. 611 (1968) (restriction on picketing permitted where limited to entrance of courthouse), with *Brown* v. *Louisiana,* 383 U. S. 131 (1966) (silent protest in library protected); *Adderley* v. *Florida,* 385 U. S. 39 (1966) (protest near jailyard inconsistent with jail purposes), with *Edwards* v. *South Carolina,* 372 U. S. 229 (1963) (protest permitted on state capitol grounds). Assuming for the moment that the letterboxes, as "authorized depositories," are under governmental control and thus part of the governmental enterprise, their purpose is hardly incompatible with appellees' use. For the letterboxes are intended to receive written communication directed to the residents and to protect such materials from the weather or the intruding eyes of would-be burglars.

Reluctance to treat the letterboxes as public forums might stem not from the Postal Service's approval of their form but instead from the fact that their ownership and use remain in the hands of private individuals.[8] Even that hesitation, I should think, would be misguided, for those owners necessarily retain the right to receive information as a counterpart of the right of speakers to speak, *Kleindienst* v. *Mandel,* 408 U. S. 753, 762–765 (1972); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 389–390 (1969); *Lamont* v. *Postmaster General, supra,* at 307; *Martin* v. *City of Struthers,* 319 U. S., at 143. Cf. *Procunier* v. *Martinez,* 416 U. S. 396, 408 (1974) (communication by letter depends on receipt by addressee). On that basis alone, I would doubt the validity of 18 U. S. C. § 1725, for it deprives residents of the informa-

---

[8] But see *Marsh* v. *Alabama,* 326 U. S. 501 (1946).

tion which civic groups or individuals may wish to deliver to these private receptacles.[9]

I remain troubled by the Court's effort to transform the letterboxes entirely into components of the governmental enterprise despite their private ownership. Under the Court's reasoning, the Postal Service could decline to deliver mail unless the recipients agreed to open their doors to the letter carrier—and then the doorway, or even the room inside could fall within Postal Service control.[10] Instead of starting with the scope of governmental control, I would adhere to our usual analysis which looks to whether the exercise of a First Amendment right is burdened by the challenged governmental action, and then upholds that action only where it is necessary to advance a substantial and legitimate governmental interest. In my view, the statute criminalizing the placement of hand-delivered civic association notices in letterboxes fails this test. The brute force of the criminal sanction and other powers of the Government, I believe, may be

---

[9] The Court announced the First Amendment rights of recipients in *Lamont* v. *Postmaster General*, 381 U. S. 301 (1965). There, the Court struck down a postal regulation denying delivery of Communist propaganda sent from outside the country, even though the regulation permitted such delivery to recipients who notified the Postal Service in writing that they wished to receive the material. Untenable, in the Court's view, was the fact that under the regulatory scheme, "[t]he addressee carries an affirmative obligation which we do not think the Government may impose on him." *Id.*, at 307. The concern for the addressee's First Amendment rights should govern here.

[10] Appellant suggests no First Amendment problem is presented because residents would not erect letterboxes but for the Postal Service, and the First Amendment did not compel the creation of the Service. Brief for Appellant 18–19. This argument obviously proves too much, because the First Amendment did not ordain the establishment of schools or libraries, and yet we have held that once established, these public facilities must be managed consistently with the First Amendment. *Tinker* v. *Des Moines Independent School Dist.*, 393 U. S. 503 (1969); *Brown* v. *Louisiana*, 383 U. S. 131 (1966).

deployed to restrict free expression only with greater justification. I dissent.

JUSTICE STEVENS, dissenting.

JUSTICE MARSHALL has persuaded me that this statute is unconstitutional, but I do not subscribe to all of his reasoning. He is surely correct in concluding that content-neutral restrictions on the use of private letterboxes do not automatically comply with the First Amendment simply because such boxes are a part of the Postal Service. Like libraries and schools, once these facilities have come into existence, the Government's regulation of them must comply with the Constitution. See *ante,* at 151, n. 10. I cannot, however, accept the proposition that these private receptacles are the functional equivalent of public fora.

My disagreement with the Court and with JUSTICE MARSHALL can best be illustrated by looking at this case from the point of view of the owner of the mailbox. The mailbox is private property; it is not a public forum to which the owner must grant access. If the owner does not want to receive any written communications other than stamped mail, he should be permitted to post the equivalent of a "no trespassing" sign on his mailbox. A statute that protects his privacy by prohibiting unsolicited and unwanted deposits on his property would surely be valid. The Court, however, upholds a statute that interferes with the owner's receipt of information that he may want to receive. If the owner welcomes messages from his neighbors, from the local community organization, or even from the newly arrived entrepreneur passing out free coupons, it is presumptively unreasonable to interfere with his ability to receive such communications. The nationwide criminal statute at issue here deprives millions of homeowners of the legal right to make a simple decision affecting their ability to receive communications from others.

The Government seeks to justify the prohibition on three grounds: avoiding the loss of federal revenues, preventing theft from the mails, and maintaining the efficiency of the Postal Service.[1] In my judgment the first ground is frivolous and the other two, though valid, are insufficient to overcome the presumption that this impediment to communication is invalid.

If a private party—by using volunteer workers or by operating more efficiently—can deliver written communications for less than the cost of postage, the public interest would be well served by transferring that portion of the mail delivery business out of the public domain. I see no reason to prohibit competition simply to prevent any reduction in the size of a subsidized monopoly. In my opinion, that purpose cannot justify any restriction on the interests in free communication that are protected by the First Amendment.

To the extent that the statute aids in the prevention of theft, that incidental benefit was not a factor that motivated Congress.[2] The District Court noted that the testimony indicated that § 1725 "was marginally useful" in the enforcement of the statutes relating to theft of mail. 490 F. Supp. 157, 161–162 (1980). It concluded, however, that the Government had failed to introduce evidence sufficient to justify

---

[1] Although the Government also advances the privacy interests of the mailbox owner, those interests would of course be protected by allowing the individual owner to make the choice whether he wanted to receive unstamped mail.

[2] The Government, see Brief for Appellant 4, n. 4, cites legislative history indicating that the "principal motivation for the statute" was the protection of postal revenues and prevention of overstuffing of mailboxes. The Government later notes that "[a]lthough Congress' primary purpose in enacting Section 1725 was the protection of mail revenues, the statute also plays a role in the investigation of mail theft." *Id.*, at 7. Because this justification, unlike the other two, was formulated after the statute was enacted, it is not entitled to the same weight as the purposes that actually motivated Congress.

the interference with First Amendment interests.[3]   The Court does not quarrel with any of the District Court's findings of fact, and I would not disturb the conclusion derived from those findings.

Mailboxes cluttered with large quantities of written matter would impede the efficient performance of the mail carrier's duties.   Sorting through papers for mail to be picked up or having no space in which to leave mail that should be delivered can unquestionably consume valuable time.   Without the statute that has been in place for decades, what may now appear to be merely a minor or occasional problem might grow like the proverbial beanstalk.   Rather than take that risk, Congress has decided that the wiser course is a total prohibition that will protect the free flow of mail.

But as JUSTICE MARSHALL has noted, the problem is susceptible of a much less drastic solution.   See *ante,* at 146, n. 3. There are probably many overstuffed mailboxes now—and if this statute were repealed there would be many more—but the record indicates that the relatively empty boxes far outnumber the crowded ones.   If the statute allowed the homeowner to decide whether or not to receive unstamped communications—and to have his option plainly indicated on the exterior of the mailbox—a simple requirement that overstuffed boxes be replaced with larger ones should provide the answer to most of the Government's concern.[4]

---

[3] The District Court held that "enforcement of § 1725 against civic associations does not appear so necessary or contributive to enforcement of the anti-theft, anti-fraud or Private Express statutes that this interest outweighs the plaintiffs' substantial interest in expedient and economical communication with their constituents." 490 F. Supp., at 163.

[4] To the extent that the efficiency of the Postal Service would be impeded by the effort required for mail carriers to sort through papers for outgoing mail, the solution is again in the hands of the individual owner of the mailbox. If he wants to use this method of sending letters and wants also to receive unstamped communications, he runs the risk that his outgoing mail will not be seen by the mail carrier.

I am fully aware that it is one thing to sit in judicial chambers and opine that a postal regulation is not really necessary and quite another to run a mammoth and complex operation like the Postal Service. Conceivably, the invalidation of this law would unleash a flow of communication that would sink the mail service in a sea of paper. But were that to happen, it would merely demonstrate that this law is a much greater impediment to the free flow of communication than is presently assumed. To the extent that the law prevents mailbox clutter, it also impedes the delivery of written messages that would otherwise take place.

Finally, we should not ignore the fact that nobody has ever been convicted of violating this middle-aged nationwide statute. It must have been violated literally millions of times. Apparently the threat of enforcement has enabled the Government to collect some postage from time to time or to cause a few violators to discontinue their unlawful practices, but I have the impression that the general public is at best only dimly aware of the law and that numerous otherwise law-abiding citizens regularly violate it with impunity. This impression supports the conclusion that the statute is indeed much broader than is necessary to serve its limited purpose. Because, as JUSTICE MARSHALL has demonstrated, it does unquestionably abridge the free exchange of written expression, I agree with his conclusion that it violates the First Amendment.

I respectfully dissent.