James A. HONE, Plaintiff,

v.

**CORTLAND CITY SCHOOL DISTRICT, and Mason Morenus, Defendants.**

No. 96–CV–1474.

United States District Court, N.D. New York.

Oct. 24, 1997.

---

James A. Hone, Oneonta, NY, Pro Se.

Thaler & Thaler (Guy K. Krough, of counsel), Ithaca, NY, for Defendants.

## MEMORANDUM-DECISION and ORDER

McAVOY, Chief Judge.

### I. BACKGROUND

This case presents the issue of whether a public secondary school can preclude a male sports reporter from school grounds after the reporter has made repeated attempts to initiate unwanted personal contacts with female school employees. The plaintiff, James Hone, was a sports reporter for the Cortland Standard Newspaper in Cortland, New York. Defendants are the Cortland City School District and Mason Morenus, the school's Athletic Director.

James Hone began working for the Cortland Standard as a sports reporter in October, 1993. As one of three people in the sports writing department, Hone's main duty was to cover Cortland City School District athletic contests at the junior high and senior high, although he did cover other area high school and collegiate sports. In addition to sports writing, Hone did occasional clerical work and layout of the sports section of the newspaper.

In September, 1994, Hone contacted Ms. Jamie Brown, a coach and physical education instructor at Cortland Junior Senior High School ("Cortland High"). These contacts consisted of telephone calls to Ms. Brown's residence and personal visits to Cortland High. Both parties acknowledge that Hone's

initial contacts with Ms. Brown were for personal reasons, not in furtherance of Hone's duties as a sports reporter. (Pltf's Dep. at 57–58). Ms. Brown states in her affidavit: "It became very clear to me that the nature of the calls was not for business or journalistic reasons, but because Mr. Hone wanted to pursue a personal relationship with me. Later on it seemed clear that the personal relationship he wished to pursue was of a social and sexual nature. I therefore made it very clear to Mr. Hone from an early date that I was married, that he should not call me at home, and later, that he should not call at all." (Brown Aff. ¶ 4).

On October 17, 1994, Hone sent a four-page letter to Ms. Brown at her residence in which he stated, *inter alia:* "There is no doubt that I'm attracted to you. I'll bet I'm not the only one." (Brown Aff., Ex. B). As a result of the continued personal contact, Ms. Brown states that she developed a network of co-employees within the school district utilizing phone systems and verbal warning signals when Plaintiff was on the school grounds or approaching the building so that she could make an exit through a side or back door. (Brown Aff. ¶ 5).

On November 3, 1994, Ms. Brown wrote to Hone at the Cortland Standard, stating: "I would like to reiterate that phone calls from you are not welcome. . . . If you persist in making attempts to contact me then legal action will be pursued." (Krogh Aff., Ex. D). Ms. Brown sent a copy of the letter to John Stefano, Interim Executive Principle of Cortland High, Mason Morenus, Athletic Director of Cortland High, and Jere Dexter, the Chief Sports Editor at the Cortland Standard and Hone's supervisor. In addition to sending the November 3, 1994 letter, Brown created a detailed synopsis of Hone's attempts to contact her on 9/24/94, 9/27/94, 10/6/94, 10/8/94, 10/11/94, 10/13/94, 10/14/94, 10/19/94, 10/25/94, 10/27/94, 10/29/94, 10/31/94, 11/1/94, 11/2/94. Ms. Brown mailed this synopsis to John Stefano and Mason Morenus, and sometime during this time period met with Jere Dexter at the Cortland Standard and provided him with a copy of the synopsis. (Brown Aff. ¶ 7).

Shortly after his meeting with Ms. Brown, Jere Dexter met with Hone in his office. According to Dexter, "I discussed the matters and complaints of Jamie Brown with him and warned Mr. Hone that any future contact with Jamie Brown could result in disciplinary action against him or his dismissal and advised him to keep away." (Dexter Aff. ¶ 4). On December 14, 1994, Cortland High sent Hone a letter which notified Plaintiff of the following:

You are welcome to cover varsity contests at Cortland Junior–Senior High School under the following guidelines:

1. Arrive at contest site no earlier than 30 minutes prior to game time;

. . .

4. Interview no players without the consent of the coach;

5. Leave the building when your post-game interviews are complete;

6. Have no contact whatsoever with Mrs. Jamie Brown.

(Krogh Aff., Ex. I). It appears that Hone did not directly contact Ms. Brown after his meeting with Dexter and the subsequent letter from Cortland High.

However, in late December, 1995, Hone sent a letter to Amy Snow, a soccer coach and math teacher at Cortland High, at her home address. The letter says "I love you" a number of times and also states: "I was honestly very ashamed of you for hanging up on me." (Krogh Aff., Ex. J). The letter concludes with "Goodbye sweetheart." (*Id.*). Apparently, Ms. Snow refused acceptance of the letter because the front of the envelope has written across it "Return to Sender."

In January, 1996, Ms. Snow notified Mason Morenus that Hone was harassing her, and that she had contacted the New York State Police for protection. (Morenus Second Interrog. ¶ 42). According to Morenus, Ms. Snow complained that starting in the fall of 1995, Hone had sent her letters, a package, and made numerous telephone calls; "She complained of repeated, and at times near continuous, unwanted conduct." (Morenus Second Interrog. ¶ 58).

On January 12, 1996, Athletic Director Morenus met with Jere Dexter and Kevin

Howe, Editor of the Cortland Standard. Morenus requested the meeting in order to advise the Cortland Standard that Hone was no longer allowed to attend athletic events at Cortland High. Although Plaintiff argues to the contrary, Morenus states, and Dexter affirms, that no derogatory comments were made, nor were any comments about Hone's writing skills or style made; Morenus simply relayed the complaints of the teachers and coaches, and informed the newspaper of the school's restrictions. (Morenus Second Interrog. ¶¶ 28–30; Dexter Aff. ¶¶ 12–14).

On January 17, 1996, Morenus sent Hone a letter stating:

> Because of your continued unprofessional behavior, namely unwanted and undesirable advances toward some of our female coaches, both past and present, you are no longer welcome to cover any of our contests at Cortland Jr.-Sr. High School.
>
> All contacts with our coaches are to be made in writing or by phone.... Phone messages by you will be made to the coaches at school, either through the Main Office or the Athletic Office.

(Krogh Aff., Ex. K).

The Cortland Standard discharged Plaintiff on January 24, 1996. According to Jere Dexter, "[t]he decision to terminate Mr. Hone's employment was made one or more days [after the meeting with Morenus] while Mason Morenus was not present. Mason Morenus never urged us to terminate Mr. Hone, and did not threaten or force the decision upon us by any means or in any manner." (Dexter Aff. ¶ 15).

On September 12, 1996, Plaintiff filed the instant Complaint. Plaintiff's Complaint contains no less than six federal and state causes of action alleging that Defendants have violated Plaintiff's free press rights, free speech rights, due process rights, and freedom of association. In addition, Plaintiff asserts state law constitutional violations and causes of action for defamation and malicious inducement to terminate Plaintiff's employment.

Presently before the Court is Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## II. DISCUSSION

Under Rule 56(c) of the Federal Rules of Civil Procedure, a court may grant summary judgment if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). It is the substantive law that will determine what facts are material to the outcome of a case. *See Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

Initially, the moving party has the burden of informing the court of the basis of its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The Court must then resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). However, the non-moving party must do more than simply show "that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Only when the Court concludes that no rational finder of fact can find in favor of the non-moving party should summary judgment be granted. *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223 (2d Cir.1994).

### A. Plaintiff's Federal Claims
#### i. Freedom of the Press

██ At this point in our history it is beyond peradventure that freedom of the press is "basic to the existence of constitutional democracy." *Grosjean v. American Press Co.*, 297 U.S. 233, 249–51, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936). Even a "cantankerous press, an obstinate press, [and] an ubiquitous press" are critical to the flow of information and opinions to the public. *United States v. New York Times Co.*, 328

F.Supp. 324, 331 (S.D.N.Y.), *rev'd,* 444 F.2d 544 (2d Cir.) (en banc), *rev'd,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam). Of course, implicit in the right to publish the news is the right to gather the news. "Without some protection for seeking the news, freedom of the press could be eviscerated." *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972). There is an "undoubted right to gather news 'from any source by means within the law.'" *Houchins v. KQED, Inc.,* 438 U.S. 1, 11, 98 S.Ct. 2588, 2594, 57 L.Ed.2d 553 (1978) (citations omitted).

■ However, freedom of the press is not unlimited. As the Supreme Court cautioned in *Branzburg v. Hayes,* the "First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." 408 U.S. at 684, 92 S.Ct. at 2657. The *Branzburg* Court stated that the press has no "special immunity from the application of general laws", nor does it have a "special privilege to invade the rights and liberties of others." 408 U.S. at 683, 92 S.Ct. at 2657. For example, in *Cohen v. Cowles Media Co.,* 501 U.S. 663, 668–70, 111 S.Ct. 2513, 2518, 115 L.Ed.2d 586 (1991), the Supreme Court held that the First Amendment does not prohibit recovery for a newspaper's breach of a promise of confidentiality. The *Cohen* Court stated:

> [G]enerally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news ... The press may not with impunity break and enter an office or dwelling to gather the news.

501 U.S. at 669, 111 S.Ct. at 2518.

■ Similarly, the press may not use its protection to justify otherwise illegal actions. *U.S. v. Sanusi,* 813 F.Supp. 149, 155 (E.D.N.Y.1992) (*citing Associated Press v. NLRB,* 301 U.S. 103, 132–33, 57 S.Ct. 650, 656, 81 L.Ed. 953 (1937) ("The publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.")); *Galella v. Onassis,* 487 F.2d 986, 995–96 (2d Cir.1973) ("There is no

threat to a free press in requiring its agents to act within the law."). Nor does the press have a right of access superior to the general public's. "[W]hen the sought after speakers are unwilling to speak, or their speech is restrained constitutionally, the media's right to gather news does not mushroom into an unqualified right to badger and cajole for the purpose of obtaining access to information to which the general public is not otherwise entitled." *U.S. v. Simon,* 664 F.Supp. 780, 787 (S.D.N.Y.1987), *aff'd,* 842 F.2d 603 (2d Cir.1988); *see also Saxbe v. Washington Post Co.,* 417 U.S. 843, 850, 94 S.Ct. 2811, 2815, 41 L.Ed.2d 514 (1974) ("The proposition 'that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally ... finds no support in the words of the Constitution or in any decision of the Court.'") (*quoting Pell v. Procunier,* 417 U.S. 817, 833–35, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974)).

■ As the preceding cases make clear, the press does not enjoy an unfettered right of access for news gathering. Moreover, in the present context the press's right of access must be balanced against the countervailing pedagogical interests of the school. As the Supreme Court stated in *Tinker v. Des Moines Independent Community School Dist.,* "the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." 393 U.S. 503, 507, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969). Although Hone's conduct does not appear to be criminal, it is undisputed that it was bothersome to Defendants' employees. Plainly, a school has the authority to protect its employees from unwanted and bothersome contact on school property.

■ While the Court questions whether Plaintiff has standing to assert an individualized right of access to Cortland High, we will leave this issue for a later day because the Court finds that neither Hone's, nor the Cortland Standard's, rights have been violat-

ed. First, Cortland High's restrictions are reasonable and narrowly tailored. On January 17, 1996, Cortland High's Athletic Director sent Hone a letter outlining the restrictions:

> ... you are no longer welcome to cover any of our contests at Cortland Jr.-Sr. High School.
>
> All contacts with our coaches are to be made in writing or by phone.... Phone messages by you will be made to the coaches at school, either through the Main Office or the Athletic Office.

(Krogh Aff., Ex. K). The Defendants did not restrict all forms of news gathering access to Cortland High employees: contacts made by phone and writing are permitted. Instead, the letter merely limits Hone's physical presence at Cortland High. Moreover, the restrictions only limit Jim Hone; all other reporters at the Cortland Standard are free to attend contests at Cortland High.

 Hone's argument that he cannot do his job because he cannot be physically present at Cortland High sporting events is not sufficient to establish a constitutional violation. First, Hone could continue to write about Cortland High sporting events based on secondary sources of information and based on post- and pre-event telephone calls and written correspondence. Second, Hone was not precluded from covering Cortland High sporting events at other area schools. The law is clear that restrictions on the press "do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen*, 501 U.S. at 669, 111 S.Ct. at 2518.

Thus, Plaintiff has failed to show that a genuine issue of material fact exists as to his claim that Defendants' have violated his free press rights. Accordingly, this claim must be dismissed.

### ii. Freedom of Speech

 Turning to Hone's free speech claim, the Court notes that the First Amendment does not guarantee unlimited access to government-owned property for purposes of expression and, depending on the nature of the property, the government may regulate

access. *Cornelius v. NAACP Legal Defense and Ed. Fund*, 473 U.S. 788, 798–802, 105 S.Ct. 3439, 3447–48, 87 L.Ed.2d 567 (1985). In *Cornelius*, the Supreme Court established a three-prong test for analyzing governmental restrictions on expressive activity. The first prong requires a determination of whether the speech in question is protected by the First Amendment; the second prong requires an identification of the nature of the forum for the speech; the third requires an assessment of whether the government's exclusion of the speech from the particular forum is justified. *Cornelius*, 473 U.S. at 796–98, 105 S.Ct. at 3446.

Here, there is considerable doubt as to whether Plaintiffs' attempts to make "personal contact" with Defendants' employees are protected speech. *See Swank v. Smart*, 898 F.2d 1247, 1251 (7th Cir.1990) ("Casual chit-chat between two persons or otherwise confined to a small social group ... is not protected."). Nevertheless, assuming *arguendo* that Plaintiff's conversations with Defendants' employees are protected speech, the Court will address the remaining prongs of the free speech test.

 First Amendment jurisprudence recognizes three types of speech fora, each with its own standard of review: (1) the traditional public forum; (2) the public forum created by government designation; and (3) the nonpublic forum. *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In traditional public spaces (i.e., streets and parks), "which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," the rights of the state to limit expressive activity are sharply circumscribed. *Perry*, 460 U.S. at 43–45, 103 S.Ct. at 954. For the state to enforce a content-based exclusion, it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. *Id.*

 The second category of speech fora is public property that the state has opened to the public for expressive activity.

Although a state is not required to retain indefinitely the open character of the facility, as long as it does so it is bound by the same standard of review as applies to the traditional public forum. *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 955. In addition, there is now a subcategory called a "limited public forum" within the category of the designated public forum. A limited public forum is "created when government opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Travis v. Owego–Apalachin School Dist.,* 927 F.2d 688, 692 (2d Cir.1991).

In the case of a limited public forum, the strict scrutiny applied to traditional public forums only applies to entities or genres of a character similar to those the government admits to the forum. *See Travis,* 927 F.2d at 692; *Calash v. City of Bridgeport,* 788 F.2d 80, 82 (2d Cir.1986). "[I]n a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." *Travis,* 927 F.2d at 692.

The third category of fora is public property that is not by tradition or designation a forum for public communication. The Supreme Court has recognized that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *United States Postal Service v. Greenburgh Civic Ass'ns,* 453 U.S. 114, 130, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981). A state may reserve a non-public "forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Greenburgh Civic Ass'n,* 453 U.S. at 131, n. 7, 101 S.Ct. at 2686, n. 7.

Here, the relevant forum is a non-public forum. Plaintiff has presented no evidence that Cortland High provided a forum for "expressive activity." *See Travis,* 927 F.2d at 692. During all times relevant to the instant dispute, Cortland High was providing instructional education through classroom or sports activities. When a school is not made a public forum, "[t]he public is not invited to use its facilities as a soapbox." *May v. Evansville–Vanderburgh School Corp.,* 787 F.2d 1105, 1114 (7th Cir.1986).

Accordingly, Cortland High may enforce both time, place, and manner restrictions and "reasonable" content-based regulations on speech. *Travis,* 927 F.2d at 692. Here, Defendants restrictions are content-neutral time, place, and manner restrictions. Defendants make no reference whatsoever to the content of Plaintiff's speech; no matter what he wishes to say, he cannot say it in person on school property. Plaintiff can, however, utilize other modes of communication. Communication made by phone and writing are permitted. Because Cortland High's restrictions are reasonable and narrowly tailored they do not violate Plaintiff's free speech rights. *Accord, Kuntz v. New York State Bd. of Elections,* 924 F.Supp. 364, 371 (N.D.N.Y.1996), *aff'd,* 113 F.3d 326 (2d Cir.1997) (noting the availability of alternative channels of communication).

### iii. Freedom of Association

The United States Constitution affords protection to two distinct types of association, "intimate association" and "expressive association." *See Roberts v. United States Jaycees,* 468 U.S. 609, 616–20, 104 S.Ct. 3244, 3249–50, 82 L.Ed.2d 462 (1984); *City of Dallas v. Stanglin,* 490 U.S. 19, 22–26, 109 S.Ct. 1591, 1594–95, 104 L.Ed.2d 18 (1989). The right to intimate association guarantees an individual the choice of entering an intimate relationship free from undue intrusion by the state. *Roberts,* 468 U.S. at 616–18, 104 S.Ct. at 3249. The right extends to relationships that "attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *Roberts,* 468 U.S. at 619, 104 S.Ct. at 3250. Whether the right extends to other relationships depends on the extent to which those relationships share the characteristics that set family relationships apart—small, select, and secluded from others. *Sanitation and Recy-*

*cling Industry, Inc. v. City of New York,* 107 F.3d 985, 996 (2d Cir.1997) (*citing Roberts,* 468 U.S. at 618–22, 104 S.Ct. at 3250–51).

■ The record clearly demonstrates that Plaintiff has no cause of action based on intimate association. Both Amy Snow and Jamie Brown have stated unequivocally that they do not wish to have even a personal relationship with Plaintiff, let alone an "intimate" relationship. Moreover, the Constitution does not recognize a generalized right of social association. The right generally will not apply, for example, to business relationships, *see Roberts,* 468 U.S. at 620–22, 104 S.Ct. at 3251, chance encounters in dance halls, *see City of Dallas v. Stanglin,* 490 U.S. 19, 24–26, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989), or paid rendezvous with escorts, *see IDK, Inc. v. Clark County,* 836 F.2d 1185, 1193 (9th Cir.1988).

■ The second form of associational freedom—"expressive association"—protects the right of individuals to associate for purposes of engaging in activities protected by the First Amendment, such as speech, assembly, the exercise of religion, or petitioning for the redress of grievances. *Sanitation and Recycling Industry, Inc.,* 107 F.3d at 996–97. As discussed previously, there is no evidence in the record that Plaintiff was engaged in protected First Amendment activities on school property. Thus, Plaintiff's claim under this theory must also fail.

### iv. Due Process

■ Plaintiff argues that Defendants deprived him of property and liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment. The Due Process Clause, however, is not applicable in all situations. The Court must determine whether the challenged action infringed a protected *constitutional right;* if Plaintiff's interest in attending events at Cortland Junior–Senior High school is not of a constitutional dimension, i.e., not a protected property or liberty interest, then his due process claim must fail. *Donato v. Plainview–Old Bethpage Cent. School Dist.,* 96 F.3d 623, 629 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997) (*citing Board of Re-*

*gents v. Roth,* 408 U.S. 564, 569–72, 92 S.Ct. 2701, 2705–06, 33 L.Ed.2d 548 (1972)).

■ Although the Constitution protects property interests, it does not create them. Rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. State law will determine whether Plaintiff possessed only an unprotected unilateral expectation, or instead had a constitutionally-protected "legitimate claim of entitlement." *Donato,* 96 F.3d at 629; *see also Martz v. Incorporated Village of Valley Stream,* 22 F.3d 26, 29–30 (2d Cir.1994).

■ Looking to New York State law, the Court can find no support for the proposition that Plaintiff enjoyed any right of access to school property. Indeed, Plaintiff provides no such support. Moreover, in an analogous situation the Second Circuit has stated that even a school board member does not have an unrestricted right to enter school property. *See Silano v. Sag Harbor Union Free School Dist. Bd. of Educ.,* 42 F.3d 719, 724 (2d Cir.1994) ("As a Board of Education member, Silano did not have an unrestricted right to enter the school classrooms or hallways during school hours.") (*citing Coughlan v. Cowan,* 21 Misc.2d 667, 190 N.Y.S.2d 934, 937 (Sup.Ct.1959) and *Matter of Bruno,* 4 Ed.Dept.Rep. 14, 17–18 (1964)).

■ Furthermore, any damage to Plaintiff's reputation alone, even by a government entity, does not implicate an interest protected by the Due Process Clause. *See Paul v. Davis,* 424 U.S. 693, 699–707, 96 S.Ct. 1155, 1160–63, 47 L.Ed.2d 405 (1976). As the Second Circuit has stated: "Our cases have interpreted *Paul* to require the modification or termination of some legal right or status before damage to reputation rises to the level of a constitutional deprivation." *Silano,* 42 F.3d at 724 (*citing Martz,* 22 F.3d at 31–32 and *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.1989)). Here, Plaintiff has failed to put forth evidence that Defendants' in-

jured his reputation, let alone that Defendants' restrictions implicated any legal right or status.

After reviewing the record, the Court must conclude that Plaintiff has not demonstrated that a genuine issue of material fact exists as to his claim that Defendants deprived him of a constitutional right protected by the Due Process Clause.

## B. Plaintiff's State Law Claims

 As a final matter, Plaintiff alleges that Defendants violated New York law as well. It is now well settled that although the doctrine of supplemental jurisdiction is one of flexibility and discretion, it is fundamental that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). "A district court ought not 'reach out for ... issues, thereby depriving state courts of opportunities to develop and apply state law.'" *Young v. New York City Transit Auth.*, 903 F.2d 146, 164 (2d Cir.1990) (*quoting Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 757 (2d Cir.1986)). Thus, supplemental jurisdiction should not be exercised merely because "the exercise of such judicial power is desirable or expedient." *United States v. Town of North Hempstead*, 610 F.2d 1025, 1029 (2d Cir. 1979).

Furthermore, exercising supplemental jurisdiction over claims based on the New York Constitution "would violate fundamental principles of federalism and comity" because "New York State has a definite interest in determining whether its own laws comport with the New York Constitution." *Young*, 903 F.2d at 163–64; *see also* 28 U.S.C. § 1367(c)(1) (district courts may decline to exercise supplemental jurisdiction if "the claim raises a novel or complex issue of State law").

Accordingly, having determined that Plaintiff's federal claims should be dismissed, this Court chooses to exercise its discretion and dismiss the remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3) ("[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction.").

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED. It is therefore **ORDERED**, that Plaintiff's Complaint is DISMISSED in its entirety. Plaintiff's federal claims are dismissed with prejudice. Plaintiff's state law claims are dismissed without prejudice.

**IT IS SO ORDERED.**