**In re: George Dunbar PREWITT**

**No. 4:96MC1–M.**

United States District Court,
N.D. Mississippi,
Greenville Division.

July 23, 2003.

George Dunbar Prewitt, Jr., Greenville, Pro se.

## MEMORANDUM OPINION

MILLS, District Judge.

This matter comes before the court after an April 1, 2003, hearing for George Dunbar Prewitt ("Prewitt") to show cause why he should not be banned from the third floor of the United States District Court located at 305 Main Street in Greenville, Mississippi—and a hearing on June 12, 2003, for Prewitt to show cause why he should not be banned from all federal courthouses in the Northern District of Mississippi. Prewitt, who is proceeding *pro se* in this matter, is a member of the Mississippi Bar Association and the bar of this court.

Prior to April 1, 1996, Prewitt frequently appeared on the third floor of the Federal Courthouse in Greenville to file pleadings and use the law library. On April 1, 1996, Magistrate Judge Bogen concluded that Prewitt posed a security risk and rewarded him with an order banning Prewitt from the third floor of the federal building in Greenville. Prewitt had accused the Magistrate Judge by word of mouth of harboring racial animus against him. Prewitt had also directed slanderous and anti-Semitic remarks toward the Magistrate Judge and Fifth Circuit Court of Appeals Judges.

### George Dunbar Prewitt's Prior Litigation

George Dunbar Prewitt became a member of the Mississippi Bar Association on December 19, 1988. Soon thereafter Prewitt became fairly active in appearances before judicial officers and their staff members. Prewitt has become adept at punishing those with whom he has a personal conflict by filing and pursuing frivolous lawsuits against them. Prewitt has been sanctioned several times in the Northern District of Mississippi for these practices. A review of some of his juridical sparrings are documented in part by the following incidents.[1]

In a May 16, 1995 letter from Prewitt to Judge Gray Evans, a state court judge, Prewitt complained that Magistrate Judge Bogen (who was then a Mississippi circuit court judge) had removed Prewitt from the list of those attorneys who serve as public defenders, saying:[2]

It is my belief that a religious war, using racism as a wedge to separate White Christians from African Christians, is being conducted by non-Christians and the descendants of non-Christians against the Christian people in America and in Mississippi. [Now United States Magistrate] Judge **Bogen** and George Kelly are descendants of non-Christians, and they apparently are interested in destroying the lives of as many African Christians as possible, before the non-Christians turn their attention to the White Christians.

. . . .

It is my belief that so venal a hatred from Christians by non-Christians is rooted in the 8,000 year old enmity between Western culture and Asian culture.

. . .

Thus, all those who attempt to restore and maintain the rights-based theory of jurisprudence, which is the heritage of Africa and Greece, always find themselves confronted, in secret, by the forces of Asian utilitarianism. Asian utilitarians, as a group, simply want to tell everyone else when to go and come, while Western Christians believe that community harmony is best fostered by equality of opportunity for the individual. Asian utilitarians want the group advantage of attacking Westerners as individuals, and so they hide their unity of purpose and their Asian ancestry.

In a June 13, 1995, "Response to Defendant's Motion for Sanctions, *Inter Alia*" in a case before the Northern District of Mississippi[3], Prewitt argued the following:

---

1. There is no particular order to these quotes—just the common theme of George Dunbar Prewitt's persistence in prosecuting meritless cases and generating scattered diatribes against those with whom he perceives a dispute.

2. In all the quotes that follow, Prewitt's recitation of the names of the judges of this court have been set in bold and italics.

3. *Prewitt v. Moore, et al.,* 4:94CV10–B–O.

Mississippi Valley Gas Company and Rodney Huggins once again move this court for sanctions against the plaintiff. It is merely a continuation, on the part of certain *nouveau riche* and big shot Caucasians, of their effort to drive the African plaintiff and his family from an integrated neighborhood in Greenville, Mississippi.

. . .

It is apparent that the big shot, Caucasian controlled public utilities have used the plaintiff's property as a conduit for their various money-making enterprises, and that to continue their illegal trespasses, the public utilities have decided to drive the African plaintiff off his property and out of Greenville, Mississippi.

. . .

Judges Eugene *Bogen*, Gray Evans, and the Washington County Public Defender, however, believed in obtaining pleas of guilty from as many African–Americans as possible, with or without attention to constitutional and statutory rights.

. . .

After my termination [as a public defender in Washington County], Judge *Bogen* refused to allow me to represent indigent clients in my private practice of law, and now Judge *Bogen's* wife, Lanier Sykes Bogen, is attempting to develop homes in and around the very street in which I and my family reside.

. . .

I have attempted to comply with the orders of this court in every way possible, and it is the Caucasian attorneys in this matter who are permitted to flaunt the rules of discovery by reviewing a deposition without notice to the deponent and before the review of the deponent, all in violation of the rules surrounding depositions.

. . .

Since the attorney's clients summoned the police for me moving my sod on my property on January 5, 1994, I suspect that I would have been sentenced to life imprisonment had I obtained a deposition under the same circumstances as did the attorney in this case.

. . .

These allegations, if permitted to be aired before a Mississippi jury, will also point out the conspiracy of a few, big shot Caucasians against the voting rights of Africans in Mississippi, against the plaintiff, and against any effort of Africans and Caucasians in Mississippi to live in peace and harmony in integrated neighborhoods.

In a continuation of his unique interpretation of ordinary events, Prewitt stated, in a filing before the Mississippi Supreme Court, "It appears to be no small coincidence that the Bogen Real Estate Firm, headed by Judge *Bogen's* wife, was arrogant and cruel enough to even leave a business card at my door during this same period. This may have been *Bogen's* way of telling me to get out of the neighborhood." ("Petition for Order of Mandamus to Eugene Bogen, Circuit Judge," submitted to the Mississippi Supreme Court in May of 1995). In this same petition, Prewitt continued:

In my opinion, Judge *Bogen* refuses to appoint any attorney, to represent criminal indigents, who seeks to prepare a constitutional and statutory rights-based defense. Instead, Judge *Bogen* tries to implement the ideal society through implementation of his innate utilitarianistic views, *i.e. plead* as many African Chistians guilty as possible, so that people from a non-Christian, non-African, Asian background can teach the rest of us

common Christian folk how to structure our lives.

In this state, we have a long history of commitment to a rights-based jurisprudence, starting with the Christian Europeans who wrote the 1832 Mississippi Constitution in which even slaves were given the right to grand jury inquiries in capital cases. Those 1832 Mississippi Christians even took steps to abolish slavery.

However, we know that the foreign and domestic utilitarians, in order to maintain slavery, somehow managed to start the Civil War in an effort to destroy the United States rather than follow the lead of the 1832 Christians in Mississippi. The utilitarians must not be allowed to drive wedges between European and African Christians as they have done for the past 135 years.

The courts of Mississippi must employ a rights-based jurisprudence while leaving it to the legislature to resolve the competing interests of utilitarianism. I may not be the best attorney in Mississippi, but I should be given the chance to at least place my name alongside those attorneys who wish to represent criminal indigents without being denied that chance by a Judge who is often reversed by this Court because of his odd legal concepts, *i.e.*, removing an African lady from a deliberating jury because she refused to go along with what Judge *Bogen* and the other jurors wanted.

On June 26, 1995, Prewitt filed a "Motion for *En Banc* Reconsideration" with the Mississippi Supreme Court, making the following unfounded remarks:

The only explanation for Judge *Bogen's* inconsistent actions is either judicial incompetence, or a virulent utilitarianism against Africans, who are represented by African attorneys who seek to vindicate the rights of the poor Africans.

There may also be a more malevolent motive for Judge *Bogen's* actions.

Judge *Bogen* is a descendant of Jews, and descendants of Africans and Jews have not been on the best of terms in recent years. In addition, Jews are descended from the Far East Asian racial group that includes the Japanese and Koreans, who also use the term Chosen People as descriptive of the Koreans. The late Moshe Dayan, a top military leader in Israel, and a Japanese Government official, both described Africans as being the problem with America.

As loathesome [sic] as this possibility may be, this type of Asian racism, practiced by Asian Jews and Japanese against Africans, may also explain the apparent enmity of Judge *Bogen* against poor Africans who attempt to vindicate their constitutional rights.

. . .

As noted earlier, utilitarianism is not the constitutional province of the courts, and as much as Judge *Bogen* may believe that he is helping society by putting certain undesirables in prison, Judge *Bogen* must forgo the utilitarian principles of some other society for the egalitarian principles of equality, which egalitarian principles are the constitutional domain of the courts in Mississippi. In Mississippi, and in America, the requirement that all people be accorded equality before the law has its origin in the principles of Christianity, and not in a society which practices utilitarianism.

(June 16, 1995, order denying *en banc* reconsideration of petition for a writ of mandamus, Mississippi Supreme Court Cause No. 95–00565).

In an appeal to the Fifth Circuit Prewitt filed a "Motion for En Banc Review of the November 24, 1995 Order, Motion for Clarification of the November 24, 1995 Order, and Motion for Recusal of All Judges

Who Trace Their Blood Lineage Back to the Man Called Jacob or Israel in the Bible." It states, in pertinent part:

I now make it plain that all members of this court who trace their genealogical blood line back to the man called Jacob or Israel in the Bible should recuse themselves from this case.

. . .

For the reasons expressed below, that ancestry is an issue in the underlying case, and the judges of this court must take such ancestry into account to determine if they should recuse themselves from this case.

. . .

Christians of African descent believe in the "rights of equality" of all people as the born-again tenet of their faith, while Asian Jews, who rely upon genealogical blood lines to establish a person's position in the world community, believe in a "utilitarian" system where pre-ordination, based upon consanguinity, places the family members of those descended from Jacob at the helm of government, to the total exclusion of those who believe in a merit system based upon equality of opportunity.

. . .

[United States District Court Judges] *Biggers* and *Davidson* are corrupt to the core, but their actions cannot serve to equitably preclear the 1973 voting changes in § 3312, for the law is clear that unprecleared voting changes are invalid laws until precleared.

. . .

Thus, it is plain that *Biggers* took criminal actions to cover up his personal benefit from the failure to preclear § 3312's 1973 voting changes . . . .

. . .

In summation, this case deals expressly with the extortion of African–American voting rights by Asian Jews who trace their lineage back to the man called Jacob in the Bible, and the illegal de facto transfer of power from elected officials, in the predominantly African–American Greenville, Washington County, Mississippi area, to a group of predominantly non-African attorneys and Judges of Asian–Jewish descent who trace their blood lineage back to Jacob in the Bible. In addition, two Mississippi federal judges from the Northern District of Mississippi [Judges *Biggers* and *Davidson*,] who trace their lineage back to Jacob in the Bible[,] have covered up Voting Rights violations by the State of Mississippi and one of those judges altered the transcript of an October 18, 1994 hearing to cover up the fact that the two federal judges had written a decision in which the appellant appeared, and in which they fraudulently concealed up [sic] their benefit from the Voting Rights Act violations.

(Fifth Circuit Cause No. 95–60519).

In *Prewitt v. Alexander, et al.,* 4:94CV94–B–O (N.D.Miss.), Prewitt submitted a *pro se* document entitled "Proposed Addendum to Pretrial Order," which was, in reality, Prewitt's announcement that he would no longer communicate with United States District Judge Neil Biggers, who presided over the case. It was also another opportunity for Prewitt to argue that he is the victim of an ancient and ever-expanding conspiracy by "Asian Jews."[4]

The plaintiff believes the U.S. District Judge Neil *Biggers* has committed crim-

**4.** As discussed below, the conspiracy expands to include each and every judge who rules against Prewitt.

inal acts, in altering, or causing to be altered, the official transcript of an October 18, 1994 hearing in this matter.

. . .

[S]ince the plaintiff will no longer submit any further motions or other pleadings of any type of objection to Judge *Biggers,* the plaintiff will make his arguments of fact and law to the jury, with full use of proffers when Judge *Biggers* bars certain evidence of the plaintiff. It should be clear that the plaintiff intends no further communication of any sort with Judge *Biggers,* and will only address the jury if and when one is sworn.

. . .

The plaintiff contends the following *summation* of the facts that will be presented to the jury:

(a) That a utilitarian conspiracy exists, by some Asians and some descendants of Jews, to imprison and otherwise deprive Americans of African origin of their right to vote, the right to live an integrated neighborhood, and the right to a proportionate share of properly drawn voting districts, in order that some Asians and some descendants of Jews might maintain a despotic, disproportionate control of the levers of governmental power in Greenville and the Delta area.

(b) That the object of this ruthless and garroting conspiracy is the political and economic strangulation of the two governmental pillars, the judiciary and the right to vote, which vindicate all other constitutional and statutory rights of Americans of African origin in particular.

. . .

(d) That defendants Kelly and *Bogen* are both descendants of Jews and that both took actions . . . which strike at the heart of our system of checks and balances in Mississippi government.

(e) That the Bogen Real Estate Agency, owned by defendant *Bogen's* wife, left a business card at the home of the plaintiff, which card was perceived as a crude and arrogant message suggesting that the plaintiff get out of the integrated neighborhood, in which *Bogen's* wife wanted to build and sell other homes.

. . .

(j) As [a] plaintiff's aside, the plaintiff would note Jenny Virden even used the term "unintelligible" . . . to describe the foregoing allegations.

It is just appalling how bubble-brain airheads, like Jenny Virden and Jere Hafter, can get away with using nonwords like "unintelligible" as the description of the work product of Africans.

In response to Prewitt's actions, Judge Biggers found that Prewitt uses frivolous lawsuits to harass those with whom he clashes:

At least one of the defendants in this action has alleged that [Prewitt] uses his position as a member of the bar to harass people with whom he has had personal disagreements in the past by filing frivolous lawsuits against them. There is evidence to support such an assertion. Filing suit against someone for the sole purpose of harassment is reprehensible, and [Prewitt] has been warned several times in the past, by both this court and the Fifth Circuit Court of Appeals, that frivolous lawsuits will not be tolerated. Not only does the plaintiff have a habit of filing vexatious litigation, but he also has a history of making outrageous, scandalous and unfounded accusations against members of the judiciary. He has charged every judge in the Northern District of Mississippi and at least one in the Southern District with being

racially biased, even going so far as to accuse one judge of participating in the lynching of a black youth. He has further accused all three judges of fraud corruption and lying. He has asked that his most recent case be heard by judges from outside the Fifth Circuit. None of [Prewitt's] accusations against the judiciary have had enough merit to survive the initial stage of judicial scrutiny. Prewitt does not limit his castigation of the judiciary to the judges of the Northern District of Mississippi. In a brief filed in one of [Prewitt's] voting rights cases, Prewitt states:

> [I]t is clear that the history of racial lynchings and discrimination could not have occurred without the instigation and connivance of the Mississippi judiciary. It is time that the judiciary of Mississippi is accountable to the people for its misdeeds.

To those familiar with Prewitt, statements such as these are not uncommon. *Prewitt v. Alexander, et al.*, 4:94CV94–B–O (memorandum opinion of February 22, 1996 finding sanctions appropriate [5]).

When this court asked Prewitt at the June 12, 2003, show-cause hearing whether he had accused any judges of this court of participating in a lynching, Prewitt acknowledged that he had heard a rumor that one federal judge had *attended* the lynching of a black youth known as "John the Baptist"—*and had asked the judge on the record if the rumor were true.* This is the type of outrageous, disrespectful and scandalous conduct that members of the bar and judiciary have come to expect from George Dunbar Prewitt.

### Procedural Posture

On June 25, 2002, more than six years after entry of the Magistrate Judge's im-position of sanctions, Prewitt moved the court to reconsider the 1996 order under FED. R. CIV. P. 60(b). He alleged that the Magistrate Judge had issued the order: (1) without subject matter jurisdiction, (2) without providing Prewitt notice and a meaningful opportunity to be heard in the matter, and (3) without regard for the Magistrate Judge's own involvement in the case. Prewitt insists that the Magistrate Judge should have recused himself. For these reasons, Prewitt argued that the 1996 judgment was void. On July 8, 2002, this court denied Prewitt's June 25, 2002, motion for reconsideration as untimely. Prewitt subsequently peppered this court with motions on July 11, July 12 and July 29, 2002. Prewitt reiterated his previous arguments and set forth two additional arguments: (4) that void judgments may be attacked under FED. R. CIV. P. 60(b)(4) at any time, and (5) the judgment is void also because it was not accompanied by a separate document in accordance with FED. R. CIV. P. 58. This court denied these motions on August 6, 2002, and Prewitt appealed the court's July 8, 2002, denial of reconsideration. The Fifth Circuit found that motions under FED. R. CIV. P. 60(b)(4) are not subject to a time limitation. It vacated the denial and remanded the case, ordering this court to hold a show-cause hearing regarding why Prewitt should not be banned from the third floor of the Greenville Federal Building.

A show-cause hearing was held on April 1, 2003, in the Greenville Federal Building before District Court Judge Michael P. Mills. Thereafter, this court determined that a second hearing was necessary to determine the question of court security and also to protect Prewitt's constitutional

---

**5.** Interestingly, the only one of the numerous defendants in that action *not* to seek sanctions against Prewitt was Judge Bogen, the recipi-ent of the bulk of Prewitt's ire and antagonism.

rights. The second hearing, requiring Prewitt to show cause why he should not be banned from all three of the federal courthouses in the Northern District of Mississippi, was held on June 12, 2003.

### The 1996 Sanctions Order Is Void

■ Prior to ruling on the merits of this case, the court must discuss the validity of the April 1, 1996, judgment. After due consideration, the court finds that the judgment in question was, in fact, void. Under FED. R. CIV. P. 60(b)(4), a judgment is void if the court lacks personal or subject matter jurisdiction or denies any party due process. *Williams v. New Orleans Public Service, Inc.*, 728 F.2d 730 (5th Cir.1984). Inarguably, the Magistrate Judge had jurisdiction over the subject matter for two reasons: (1) Prewitt is a member of the court's bar association and the Magistrate Judge has the power to monitor and censure the conduct of attorneys authorized to practice before the court and (2) The court has the power to ensure the safety and security of its judicial officers and staff. The sanction at issue was based upon Prewitt's behavior at the courthouse and the Magistrate Judge's finding that Prewitt's presence posed a security risk.

■ The Magistrate Judge had subject matter jurisdiction. The Magistrate Judge did not, however, establish personal jurisdiction over Prewitt. The accused was never served any type of process in the matter and was never given a chance to defend the allegations lodged against him prior to entry of final judgment. This clear lack of notice and opportunity to be heard renders the judgment void for failure to comport with the minimum standards required for due process. *Id.* From a tradition beginning with King John at Runneymede down to and including the Honorable George Dunbar Prewitt of Greenville, Mississippi, our American notions of simple fairness, not to mention constitutional mandates of due process, dictate that *every* man is entitled to due process of law—even a man with poor judgment, a vexatious tongue and a venomous quill. For these reasons, the court finds the April 1, 1996, judgment void.[6]

### The April 1, 2003, Show-cause Hearing

As previously stated, the Magistrate Judge, after finding that Prewitt had made frivolous filings and that his presence on the third floor of the Greenville federal building posed an unnecessary security risk, entered an order on April 1, 1996, banning Prewitt from the third floor of the federal building in Greenville. On April 1, 2003, the court held a hearing to provide Prewitt the required notice and opportunity to respond to the findings in the 1996 sanctions order. In anticipation of that hearing, the court entered an order on March 3, 2003, vacating the April 1, 1996, order which barred Prewitt from the third floor of the U.S. Courthouse and Federal Building in Greenville, Mississippi, permitting him to attend the show-cause hearing and to subpoena witnesses for the hearing. Prewitt chose not to subpoena witnesses.

Prewitt testified at the April hearing that he did not know why the Magistrate Judge found his presence at the courthouse to be a security risk. He also stated that the notice of the April hearing was inadequate to inform him of what conduct the court found objectionable, thus again depriving him of the opportunity to provide a meaningful response. Not to be goaded into anarchy, this court nonetheless invited Prewitt numerous times to respond to the 1996 findings and to explain

---

**6.** As the court finds that the 1996 final judgment is void, the court need not address Prewitt's other scattered arguments regarding that issue.

the context of his provocative remarks, actions and submissions to the court. He repeatedly declined, generally professing unfamiliarity with any of the allegations suggested by the court. He did, however, concede that he had requested the recusal of all Fifth Circuit judges in cause number 95–60519 "who trace their blood lineage back to the man called Jacob or Israel in the Bible [because] that ancestry is an issue in the underlying case."

**The June 12, 2003, show-cause Hearing**

At the April 1, 2003, show-cause hearing, Prewitt complained that the notice of hearing did not specify the conduct for which he faced sanctions. After taking the matter under consideration and out of an abundance of caution, this court set a second show-cause hearing for June 12, 2003. Along with the notice of that hearing, the court attached various documents detailing Prewitt's questionable actions and behavior in this court, in state court and in the Fifth Circuit. With respect to those attached documents, Prewitt was to show cause why he should not be banned from entering *any* of the courthouses in the Northern District of Mississippi. Prewitt was again permitted to subpoena witnesses. Again, Prewitt called only himself as a witness.

Prior to addressing the documents at issue, Prewitt made several general arguments before the court. He first argued that his actions and anti-Semitic statements are protected speech under the First Amendment and, therefore, beyond the power of the court to censure. He again argued that his due process rights were violated because the documents attached to the order setting the second show-cause hearing were insufficient to notify him of the behavior for which he might

be sanctioned. Finally, he argued that the court could not sanction him for his actions as those actions had occurred so long ago that they should be subject to some statute of limitations.[7]

As discussed above, the 1996 sanctions order is void for several important procedural reasons. The court has, by virtue of the two show-cause hearings, corrected those procedural defects and now turns to the merits of this case. The question now before the court is whether Prewitt should be banned from entering any of the federal courthouses in the Northern District of Mississippi in light of the documents attached to the order setting the instant hearing.

### Prewitt's Sanctionable Conduct

Though the documents in question are in the record, quotes from them were included above for clarity. Prewitt's own writings and previous filings in the Northern District Court establish that Prewitt has long engaged in a pattern of conduct in which he exacts revenge against those who differ with him by filing and relentlessly prosecuting frivolous lawsuits against these perceived antagonists in federal and state court. The Northern District Court has frequently sanctioned Mr. Prewitt. He has been rebuked by a large monetary sanction. He has even been prohibited from filing lawsuits in this court without court permission. These orders have failed to diminish Prewitt's enthusiasm for judicial confrontation. Once a presiding judge makes a ruling against Prewitt in these matters, Prewitt then shifts his focus to that judge, castigating the judge in pleadings filled with totally unfounded slanderous and scandalous accusations.

---

**7.** Prewitt did not, however, specify which statute of limitations might apply, and this court has found none.

### Prewitt's Arguments at the Hearings [8]

Although Prewitt was loath to discuss the *facts* surrounding the 1996 sanctions order at either hearing, he readily presented his *legal* arguments to the court.

First, he argued that he had already been sanctioned in another case before this court for the same behavior in the cases cited by the Magistrate Judge. Thus, Prewitt argued, he should not be sanctioned a second time for the same infractions. This argument is without merit. The court finds that Prewitt was not sanctioned twice for the same conduct. It has instead examined Prewitt's past conduct and found reason to ban him from the courthouse.

Second, Prewitt argued that the Magistrate Judge did not have jurisdiction to impose sanctions. The issue of jurisdiction is discussed above in this opinion and will not be repeated here.

■ Third, Prewitt claimed that the prohibition against his entering the federal courthouses in the Northern District of Mississippi constitutes an illegal seizure in violation of the Fourth Amendment. This argument is erroneous. The authority Prewitt relies on for this proposition discusses the acts of police officers in confining suspected criminals to a small area from which they are not free to leave *in the context of the investigation of a crime.* United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). This case involves the proposed order of a court prohibiting an attorney from entering the three federal courthouses in the Northern District of Mississippi *in the context of a civil penalty for misbehavior at the courthouse.* Unquestionably, Prewitt has neither been "seized" under any

reasonable interpretation of that word, nor has he been confined to a small area from which he cannot leave for the purpose of interrogation. Within the bounds of the law, he is free to go wherever he chooses in the whole wide world—*except* for the federal courthouse in Greenville. Prewitt has taken this argument out of its appropriate criminal law context and it, too, is without merit.

Prewitt's fourth argument was that the sanction imposed violated the court's local Rule 83.1(C)(1), which requires thirty-day notice and a hearing prior to imposing sanctions. This argument is now moot, as the court has found the 1996 imposition of sanctions void and has provided new notice and a hearing on the matter of sanctions.

■ Fifth, Prewitt argued that the judges in three of the eleven cases cited in the 1996 order based their decisions upon bias against him rather than on the facts and law pertaining to the cases in question. Prewitt claims that three of the eleven cases deemed by the Magistrate Judge as frivolous in fact had merit and thus would not support the 1996 sanction order. The court has already ruled that it will not resurrect these old cases and examine their merits. Even assuming the three cases Prewitt mentioned at the hearing did have merit, Prewitt has not challenged the fact that the remaining eight cases were frivolous. One frivolous case coupled with the other factors discussed in this order would support the sanction imposed.

■ Prewitt's sixth claim is that the sanction imposed is a type of "criminal contempt" punishment, warranting all of the due process requirements of a criminal trial. The Supreme Court's analysis of

---

8. Due to the nature of the hearings, Prewitt's meandering style of presentation and the fact that Prewitt argued some of the same points in both hearings, the court will discuss Prewitt's arguments from both hearings in the same section.

criminal and civil sanctions, quoted below, is succinct and informative on this issue.

> Criminal contempt is a crime in the ordinary sense, and criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings. For serious criminal contempts involving imprisonment of more than six months, these protections include the right to jury trial. In contrast, civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required. [FN2]
>
> > [FN2] We address only the procedures required for adjudication of indirect contempts, i.e., those occurring out of court.[9] Direct contempts that occur in the court's presence may be immediately adjudged and sanctioned summarily, and, except for serious criminal contempts in which a jury trial is required, the traditional distinction between civil and criminal contempt proceedings does not pertain.

International Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 826–27, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (citations omitted). The sanction imposed on Prewitt was not a penalty for civil or criminal contempt since Prewitt was not in violation of a specific court order. Instead, he repeatedly violated the rules and decorum of this court which members of the bar of this court, and even untrained *pro se* litigants, are expected to honor. Further, if the court were to find that the sanction imposed was for contempt, it would clearly have been civil contempt, as the sanction entailed only a small restriction and no monetary penalty or jail time. The case Prewitt cites in support of his criminal penalty theory involves a judge imposing a fine of $52 million for violation of a labor injunction. *Id.* While it is clear that a judge-imposed fine of $52 million constitutes a criminal penalty, it is just as clear that restriction from entering the premises of the Northern District federal courthouses is not.

 Seventh, Prewitt argued that imposing any type of sanction under the facts of this case would violate his First Amendment right to freedom of speech by punishing him for his beliefs. He argued that the sanction imposed violated his First Amendment rights of free speech and association. This seventh argument fails, as well. Prewitt has failed to distinguish between his right as a citizen to speak in a public place dedicated as a forum for speech and his privilege as an attorney or *pro se* litigant to present arguments before a court of law. Under the doctrine of unconstitutional conditions, the government may not require a person to give up a constitutional right (in this case, the right to enter onto public property) in exchange for a discretionary benefit (in this case, the ability to practice law before the court or to advocate one's position in court). Such has not occurred here. *Dolan v. Tigard,* 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). Government property which is not, by tradition or designation, a forum for public communication is governed by different standards than those governing property where citizens

---

**9.** In all likelihood the Magistrate Judge acted in accordance with the language in footnote 2 when he summarily imposed sanctions upon Prewitt. It seems that this language would encompass infractions of rules as well as specific court orders.

traditionally air their views. *Perry Education Ass'n v. Perry Local Educator's Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The First Amendment does not guarantee public access to property owned or controlled by the government. *United States Postal Service v. Greenburgh Civic Ass'n,* 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). The government may reserve a forum for its intended purposes, communicative or otherwise, as long as the reservation is reasonable and not an effort to suppress the content of speech. *Id* at 2686, n. 7. The government, like an owner of private property, has the power to reserve its property for the use to which it is lawfully dedicated. *Id.* In this case, the courthouses in this district are dedicated to the purpose of administering federal cases in an orderly and expeditious manner. The court's decision to ban Prewitt from the courthouse is reasonable in light of the fact that Prewitt has become a nuisance and a potential threat to the judicial officers there—not because of the content of his speech. The court is not punishing Prewitt for the content of his speech. However, Prewitt's inflammatory and threatening speech towards judicial officers of this court coupled with his unnecessary presence in the courthouse render him a legitimate security threat.

■ In his eighth and final argument, Prewitt alleged that the order setting the second show-cause hearing failed to provide him with adequate notice of the specific conduct for which he faces sanction. The order in question directed Prewitt to "appear before the court at 10:00 a.m., Thursday, June 12, 2003, in the Federal Building at 911 Jackson Avenue in Oxford, Mississippi to show cause why he should not be prohibited from entering any of the courthouses of the United States District Court for the Northern District of Missis-

sippi *in light of the documents attached to this order.*" (emphasis added). The court attached nine documents, totaling eighty-one pages, to the order. The entire contents of each document were included to ensure that none of Prewitt's remarks or the findings of various courts were taken out of context.

Prewitt argues that so many documents were attached to the order that he could not reasonably be expected to know which parts the court might find objectionable. Such an argument is disingenuous. One of a childlike mind might refer to such a defense as "wiggle-worming." Wiggle-worming constitutes a poor excuse, not a defense. This court has provided Prewitt with but a small sample of the disrespectful, anti-Semitic and threatening diatribe that he has submitted to this and other courts over the years. Eighty-one pages certainly was not too large a sample for Prewitt to digest in the nearly two months between the time the hearing was set and the time it took place. If Prewitt truly had a question regarding which parts of the documents gave the court pause, he could have asked the court for *clarification* of the order within a reasonable time prior to the hearing. Instead, Prewitt waited until June 9, 2003, less than three days before the hearing, to submit a motion seeking, among other forms of relief, to *cancel* the hearing. He claimed the notice was constitutionally inadequate. Clearly, Prewitt sought not to clarify the court's objective at the hearing, but to avoid the hearing altogether. At the second hearing, the court read the specific passages at issue to Prewitt and gave him the opportunity to respond to them, one at a time. The court finds the notice, given under these circumstances, was more than adequate. For these reasons, the court concludes that Prewitt's eighth argument is also without merit. In sum, all of Prewitt's arguments regarding the court's abili-

**562**

ty to sanction his conduct are without merit.

### The Law Governing Sanctions

The court's power to impose sanctions in this unusual circumstance flows not from statute or rule, but from its inherent power, which emanates from the "control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–631, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)).[10] The court possesses the discretion to tailor sanctions to the particular facts of the case. FED. R. CIV. P. 11, Advisory Committee Notes. The particular form and amount of an inherent power sanction is "uniquely committed to the sound discretion of the imposing court." *Crowe v. Smith*, 151 F.3d 217 (5th Cir.1998). The court's inherent power to impose sanctions must be used with restraint and caution; because of its potency and the limited control of its exercise, the power may be exercised only if essential to preserve the authority of the court, and the sanction chosen must employ the least possible power adequate to the end proposed. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Anderson v. Dunn*, 19 U.S. (6 Wheat) 204, 231, 5 L.Ed. 242 (1821), *quoted in Spallone v. United States*, 493 U.S. 265, 280, 110 S.Ct. 625, 635, 107 L.Ed.2d 644 (1990). A court may impose sanctions on a nonparty. *General Ins. Co. of America v. Eastern Consolidated Utilities, Inc.*, 126 F.3d 215 (3d Cir.1997). The court, however, must include the nonparty in a show-cause order to establish personal jurisdiction over him for sanctions. *McGuire v. Sigma Coatings, Inc.*, 48 F.3d 902, 907 (5th Cir.1995). As long as a party receives an appropriate hearing, he may be sanctioned for conduct occurring beyond the courtroom. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). The court should choose the least severe sanction adequate to deter sanctionable conduct in the future. *Thomas v. Capital Security Services, Inc.*, 836 F.2d 866 (5th Cir.1988).

### Discussion of Sanctions

With these governing principles in mind, the court now examines Prewitt's conduct to determine what sanction, if any, should be imposed. The court repeatedly asked Prewitt to explain his actions, anti-Semitic remarks and statements about an ongoing "religious war" in which Prewitt clearly pits himself against various judicial officers of this court. Indeed, when asked about the anti-Semitic remarks at the first hearing, Prewitt told the court that he could only remember ever mentioning that the Magistrate Judge was Jewish on one occasion and that he certainly did not remember having made anti-Semitic statements. The court's examination of the documents Prewitt submitted to this and other courts over time shows that this statement was, at best, insincere, and at worst an outright lie to the court. Even a cursory examination of the documents Prewitt has submitted to various courts over the years supports the Magistrate Judge's 1996 findings that Prewitt had made anti-Semitic statements and, more importantly, that Prewitt

---

**10.** The principles governing the law of sanctions differ only slightly among the various sources of sanctioning power. Thus, the authority cited in this memorandum opinion is based upon sanctions imposed in different circumstances such as the discovery rules, Rule 11, § 1927 and the court's inherent power. Unless otherwise stated, the rules set forth within apply to all types of sanctions.

is, indeed, a security risk.[11] The quotations above from Prewitt's prior submissions to this and other courts are merely an example of the reams of diatribe Prewitt has submitted to the unsuspecting logical world.

When the court asked Prewitt whether he had accused a judge of the Northern District of participating in a lynching, Prewitt acknowledged that he had heard a rumor that a judge of this court had *attended* the lynching of a black youth known as "John the Baptist"—*and had asked the judge on the record if the rumor were true.* This is the type of outrageous, disrespectful and scandalous conduct that members of the bar and judiciary have come to expect from Prewitt. By his own words, Prewitt clearly believes that he is engaged in a religious war and that Magistrate Judge Bogen and United States District Judges Biggers, Davidson and Senter are his foes.[12] The court cannot take threats of war against judges by a licensed attorney lightly. The word "war" suggests violence. This court has a duty to the employees, litigants, attorneys and other rightful users of the Federal Courts in the Northern District of Mississippi to ensure their safety and to maintain appropriate decorum. This judge takes personal notice that Mr. Prewitt is an affable, likable, charming individual who proudly advised the court of his prior honorable military service on behalf of this country. These facts being acknowledged, it is clear that Mr. Prewitt's personal political and racial views have so colored his thinking, to, in effect, create within his mind a martyr's complex sufficient to give this judge sufficient concern to believe that the rights of public safety outweigh Mr. Prewitt's rights to appear in the Greenville Courthouse. For these reasons the court finds that Prewitt's presence on the third floor of the Greenville courthouse indeed poses a security risk.

■ Prewitt twice argued that the court may not sanction him for his submissions to the court or his actions because such anti-Semitic and provocative speech is protected under the First Amendment to the Constitution. This argument is without merit, as Prewitt has failed to distinguish between speech made on an open street by an ordinary citizen and that made in the courthouse by an attorney of the bar of this court. As discussed above, an ordinary citizen may air, with little restraint, controversial views in public. *Konigsberg v. State Bar of California,* 366 U.S. 36, 60–61, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961). On the other hand, courts have

---

**11.** To illustrate this point, one need only read the numerous examples now included in the record of Prewitt's disturbing and anti-Semitic submissions, as well as other court documents describing Prewitt's tendency to file frivolous suits to harass and frustrate those against whom he has a personal grudge.

**12.** Apparently, Prewitt has now placed this judge on the list of foes in his ongoing religious war and believes he is the victim of religious persecution. In relevant part, Prewitt stated in his June 9, 2003, motion: "And that Judge Mills, *and every other anti-Christian* may understand me completely, I want to make it plain that I believe wholeheartedly in Jesus Christ as God of the Universe, that faith in Jesus Christ has sustained Christians in the worst of times, and that if I have to suffer for my Christian beliefs and writings, that is a small price to pay if my reward is to someday be in the eternal company of Jesus Christ and the Saints who have given their lives as courageous followers of Jesus Christ and His Testimony. I am 55 years of age, my race is almost run, my sojourn in this world diminishes with each passing day. I therefore greet this religious persecution of me with joy, for Jesus Christ taught us, in the Sermon on the Mount as related in Matthew 5:12, to 'Rejoice, and be exceeding glad: for great is your reward in heaven; for so persecuted they the prophets which were before you.'" (emphasis added).

the inherent power to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–631, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)). The court may use that power to insist that attorneys who practice before it do so with respect, upholding the dignity and solemnity of the institution. Thus, while citizens have the right to express their views on inflammatory and controversial topics, attorneys must do so wisely in court. Those who fail to observe common notions of respect for civil order and decency should not complain when their actions finally draw federal attention and reproval. Such barristers must face the consequences when the court exercises its inherent power to maintain order, discipline and integrity in its environs. The court now exercises that power.

### Sanction Imposed

▮ Prewitt's admission of his use of virulent and abusive language and his unwillingness to discuss the facts of this case show poor judgment and a lack of candor with the court. Prewitt has filed numerous frivolous and malicious actions in this and other courts, has made a nuisance of himself in the Greenville courthouse itself and has set forth in writing his belief that he is carrying on a holy war against several judicial officers of this court. As a sanction for these actions the court hereby bars Prewitt from entering the third floor of the federal courthouse in Greenville, Mississippi.[13] As Prewitt acknowledged at the first show-cause hearing that he did not have any litigation pending in state or federal court, he has no need to enter the third floor of the federal building. The fact that Prewitt poses a security risk favors a complete and permanent ban from the courthouse. However, the fact that Prewitt is an attorney would seem to require some relaxation of that requirement because he may, at some point, be required to attend a trial or hearing in federal court. Should Prewitt wish to file pleadings or other papers with this court, he must do so by U.S. Mail or private courier. Should Prewitt wish to conduct legal research, he must do so in some other location. The court may, however, for good cause shown, permit Prewitt to attend hearings for which his presence is required in one of the courthouses in this district.[14] Should Prewitt's presence at the courthouse be so required, a United States Marshal shall escort him to and from the hearing and accompany him at all times when he is in the courthouse. This opinion shall not be construed to limit or otherwise diminish any other sanctions measures regarding Prewitt. It shall merely supplement them. In particular the court notes that the February 22, 1996, order in *Prewitt v. Alexander, et al.*, 4:94CV94–B–O, requiring Prewitt to obtain leave from this court prior to filing any new cases, shall remain in effect.[15] Final-

---

13. Other courts have imposed such a sanction in similar situations. *Sassower v. Abrams*, 833 F.Supp. 253, 267 (S.D.N.Y.1993)(litigant prohibited from entering courthouse because of numerous frivolous filings in the past). The current case differs from *Sassower* in two key respects: (1) Sassower's presence in the courthouse did not pose a security risk, and (2) Sassower was not an attorney.

14. The April 1, 2003, show-cause hearing is an example of this exception. Prewitt moved for permission to attend the hearing despite the 1996 order prohibiting his entry into the court, and the court granted that motion.

15. The February 22, 1996, opinion and order, which are attached to this opinion, set forth the actions Prewitt must take to obtain leave to file a new case in this court.

ly, this court is mindful of the duty an attorney owes his client and cannot ignore its responsibility to insure the fairest and best counsel for litigants seeking attorneys to practice before this court. George Dunbar Prewitt's actions in this case and in previous cases merit review by the Mississippi Bar Association. While this court cannot predict the outcome of such a review, it is clear that the bar should be aware of Prewitt's exploits over the years in the courts of Mississippi. For this reason, the clerk shall forward a copy of this opinion to the Mississippi Bar Association for a review of Prewitt's course of conduct. A final judgment consistent with this memorandum opinion shall issue this day.

### FINAL JUDGMENT

In accordance with the memorandum opinion issued today in this cause, the court finds that sanctions against George Dunbar Prewitt are warranted.

It is, therefore **ORDERED** that

1. The April 1, 1996 order of the Magistrate Judge banning George Dunbar Prewitt from the third floor of the federal building in Greenville, Mississippi is **VOID**.

2. George Dunbar Prewitt is hereby **BANNED** from the third floor of the federal building located at 305 Main Street in Greenville, Mississippi.

3. Should Prewitt wish to file pleadings or other papers with this court, he must do so by U.S. Mail or private courier.

4. Should Prewitt wish to conduct legal research, he must do so somewhere other than the third floor of the federal building in Greenville.

5. *For good cause shown* Prewitt may attend hearings on the third floor of the federal building in Greenville when his presence is required; however, Prewitt must be escorted by a United States Marshal at all times when on the third floor inside the Greenville courthouse.

6. This opinion and final judgment do not limit or otherwise diminish any other sanctions regarding Prewitt; it merely supplements them.

7. The clerk of the court shall forward a copy of this opinion to the appropriate office of the Mississippi Bar Association so that the bar may review Prewitt's actions as an attorney in this and other cases.